**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINVIEW INC., <br><br> Plaintiff, <br><br> v. <br><br> FANDUEL, INC., <br><br> Defendant. | Civil Action No. 21-13807 (GC) (JTQ) <br><br> **OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendant FanDuel, Inc.'s Motion for Partial Dismissal of Plaintiff WinView Inc.'s First Amended Complaint (FAC) pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). (ECF No. 66.) Plaintiff opposed (ECF No. 69), and Defendant replied (ECF No. 70). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the Motion to Dismiss is **DENIED** without prejudice.

## I.    BACKGROUND[1]

This case arises from FanDuel's alleged infringement of WinView's patents: U.S. Patent Nos. 9,878,243 (the '243 patent); 10,721,543 (the '543 patent); 9,993,730 (the '730 patent); and

---

[1]    On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted).

10,806,988 (the '988 patent).  FanDuel's Motion to Dismiss focuses solely on the subject matter patentability of the '988 patent pursuant to 35 U.S.C. § 101.

WinView is a corporation that is involved in "interactive television and mobile gaming." (ECF No. 8 ¶ 3.)  WinView's "technologies enable the creation of an environment that makes the sports viewing and gaming experience more fair, engaging, and exciting."  (*Id.*)  FanDuel is a company that "provides users with daily fantasy sports and sports betting opportunities" and "is involved in the design, development, and licensing of sports betting and software for online and retail sportsbook and fantasy sports products."  (*Id.* ¶ 5.)

### A.  '988 patent

The '988 patent entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" was issued on October 20, 2020.  (*Id.* ¶ 28.)  The FAC asserts that the "[t]he inventions claimed in the '988 [p]atent relate to specific improvements in computer technologies related to distributed gaming and distributed gaming utilizing a mobile device."  (*Id.* ¶ 30.)  According to WinView, "[t]he claims of the '988 [p]atent recite new and unconventional solutions for efficiently and easily conducting multiple contests of skill or chance in a distributed environment simultaneously and in real time" and the claims "are necessarily rooted in computer technologies and provide solutions for enabling the entry of an individual in separate competitions, with separate prizes based on their single performance . . . where the pool of entrants is different for each competition."  (*Id.* ¶ 32.)  The claims further allow "a plurality of users to participate in multiple competitions with separate competitors and prizes while utilizing a single performance of the participant, such as the same selections for the competition."  (*Id.*)

The '988 patent further provides the following:

> User generated competition groups and system generated competition groups allow users to participate in multiple

competitions at once based on answering the same questions or making the same selections related to a single event. The users are informed of the availability of each competition either via email, text message or when logging into network via a website. The users select which competitions groups to join. After joining the desired groups, the users then make their selections related to the event which are transmitted to the network where the results are tabulated and transmitted back to the users. The results are separated for each competition group, so that users continually know where they stand in each separate competition. With multiple competition groups, users are able to have varying success from the same performance in multiple competitions.

. . . .

The present invention is a system and method allowing participants to simultaneously compete in multiple contests based on a single performance. For example, a user is able to participate in an open contest, compete in a team competition, and also compete against a small group of friends all utilizing a score achieved in the same event.

As a comparison, in tournaments held for bowling or golf, players are able to compete simultaneously in a gross score tournament as well as a net (handicap) tournament with the same performance. However, the contestants in the gross and net competitions are identical. The focus of the present invention is on enabling the entry of an individual in separate competitions, with separate prizes based on their single performance (score), where the pool of entrants is different for each competition.

[(ECF No. 8-4 at 11, 13.[2])]

The FAC specifically asserts claim 1 of the '988 patent. Claim 1 provides the following:

1. A server device for conducting simultaneous multiple contests of skill or chance corresponding to one or more events comprising:

a. a storage mechanism; and

b. an application for interacting with the storage mechanism to allow a plurality of users to simultaneously and in real

---

[2]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

time compete in the multiple contests of skill or chance, the application further for:

    i. receiving each of the plurality of user's input including event selections related to the one or more events and in which of the multiple contests of skill or chance the selections are to be applied, wherein the same event selections are separately and simultaneously applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously participating with a plurality of the multiple contests of skill or chance;

    ii. storing results and standings for each of the multiple contests of skill or chance based on the event selections, wherein the standings are based on the results; and

    iii. transmitting the multiple and separate standings to each client device in real time.

    [(ECF No. 8 ¶ 33.)]

Also relevant are independent claims 36 and 64, which provide the following:

    36.  A device for participating in multiple real time contests of skill or chance corresponding to one or more events comprising:

    a. A communications module for coupling to a server; and

    b. An application for utilizing the communications module for coupling to a server to communicate with the server to allow a user to simultaneously compete in the multiple real time contests of skill or chance, wherein the application is configured for receiving user input including in which of the multiple real time contests of skill or chance to join and receiving additional user input including a single set of event selections related to the one or more events, wherein the single set of event selections enable simultaneously and in real time participating separately with the selected multiple real time contests of skill or chance.

    64. A method programmed in a memory of a device comprising:

    a. generating a list of multiple contests of skill or chance to join;

b. presenting the list of multiple contests of skill or chance to join, wherein the multiple contests of skill or chance correspond to one or more events;

c. receiving user input including event selections related to one or more events and to which the multiple contests of skill or chance the selections are to be applied, wherein the event selections are separately applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously and in real time participating in the selected multiple contests of skill or chance;

d. storing results and standings based on the event selections wherein the standing are based on the results;

e. transmitting the standings to the device.

[(ECF No. 8-4.)]

## B.  FanDuel Sportsbook and Fantasy

"FanDuel's main product offerings to consumers include Fantasy and Sportsbook."  (ECF No. 8 ¶ 36.)  The FanDuel Sportsbook, which can be accessed online or through a mobile application, involves "propositions . . . based on particular sporting events that occur during the year."[3]  (*Id.* ¶¶ 38, 40.)  FanDuel Sportsbook "offers betting propositions that include traditional bets based on end-of-game outcomes, such as who will win a particular game or whether a team will win by more than a certain number of points."  (*Id.* ¶ 41.)  The product also "offers 'Live' betting propositions that are made during games and as the action unfolds.  Live betting is a significant feature of the FanDuel Sportsbook, designed to increase user engagement and enhance

---

[3]    "Sports betting involves a user placing a bet by wagering money at some fixed odds.  The matter on which the user bets is often referred to as a 'proposition' or 'prop'.  If the user wins, FanDuel pays out the bet.  FanDuel generates revenue from the difference between the payouts and the settled handle for bets that FanDuel has taken."  (ECF No. 8 ¶ 39.)

the sports betting experience." (*Id.*) If "the user is in a jurisdiction where placing bets is permitted, the user may place a bet on the proposition." (*Id.* ¶ 43.)

The FAC asserts that "[a]s the action unfolds relating to a particular betting proposition, the FanDuel Sportsbook website and app provide users with updated odds for the betting propositions" and "presents the odds and betting propositions synchronized to virtual representations of the sporting event." (*Id.* ¶ 44.) The FanDuel Sportsbook also "prevents betting propositions when the user is no longer permitted to make a selection on a particular wager" and "sends signals to lock out bets at an appropriate time to level the playing field, increase user engagement, and prevent participants from obtaining information that could give them a material advantage in their betting on the proposition." (*Id.*)

As for FanDuel Fantasy, which similarly can be accessed online or through a mobile application, the platform "provides Fantasy contests users may enter for various sports . . ., scores the contests, and distributes prizes." (*Id.* ¶¶ 46-47.) To increase user participation and corresponding revenue, FanDuel "recommends contests for users to join and provides functionality for users to enter their lineups quickly in multiple contests." (*Id.* ¶ 48.) FanDuel also "allows user[s] to easily enter an already-created lineup into additional contests." (*Id.*)

The FAC explains that "[s]ports betting and Fantasy Sports are permitted in New Jersey but not in every state." (*Id.* ¶ 50.) In an effort to "ensure compliance with different state laws and provide users with correct permission information, the FanDuel Sportsbook and Fantasy applications and website are configured to monitor the location of the device being used." (*Id.*) In a scenario when "the device is not in a permitted jurisdiction, FanDuel prevents the user from placing bets on the FanDuel app or website and the user is informed that it appears the user is located in a state that betting on FanDuel is not available." (*Id.*)

6

## II.   <u>PROCEDURAL HISTORY</u>

On July 19, 2021, WinView sued FanDuel for infringement of the '243 patent and the '543 patent.  (ECF No. 1.)  On July 28, 2021, before FanDuel entered an appearance, WinView filed the FAC, asserting patent infringement of all four patents: the '243 patent, the '543 patent, the '730 patent, and the '988 patent.[4]  (ECF No. 8.)

After WinView filed the FAC, FanDuel, along with DraftKings Inc.,[5] petitioned for *inter partes* review (IPR) before the Patent Trial and Appeal Board (PTAB) regarding specific claims of the '243 patent, the '543 patent, and the '730 patent.  (*See* ECF No. 41.)  The '988 patent was not subject to the IPR.  (*See* ECF No. 57.)  In response, the Court stayed this case "pending the final resolution of all . . . IPR petitions."  (ECF No. 46.)

After a status conference post-IPR, (*see* ECF No. 61), WinView informed the Court that it would be dismissing its patent infringement claims related to the '243 patent and the '730 patent. (ECF No. 64.)  In accordance with a stipulation filed on December 16, 2024, the Court dismissed WinView's claims based on the '243 patent and '730 patent with prejudice.  (ECF No. 65.) FanDuel subsequently filed this Motion, seeking to dismiss WinView's claim for patent infringement in relation to the '988 patent on the grounds that the '988 patent is directed to unpatentable subject matter under § 101.[6]  (ECF No. 66.)

---

[4]    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a).

[5]    WinView has sued DraftKings for patent infringement in a separate action.  *See WinView Inc. v. DraftKings Inc.*, Civ. No. 21-13405 (D.N.J. Nov. 15, 2021).

[6]    FanDuel does not raise any challenges as to the '543 patent.  (*See* ECF No. 66-1 at 5 (noting that the Motion to Dismiss relates to the '988 patent).)

III.    **LEGAL STANDARD**

"Generally, district courts adjudicating patent cases apply the substantive law of the Federal Circuit." *NovaPlast Corp. v. Inplant, LLC*, Civ. No. 20-7396, 2021 WL 5770264, at *4 (D.N.J. Dec. 6, 2021) (quoting *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012)). However, "[t]he standard governing [the] grant or denial of a Rule 12(b)(6) motion[] . . . 'is a purely procedural question not pertaining to patent law,' to which this court, and the Federal Circuit on review, applies the rule of the regional circuit." *Id.* (quoting *C&F Packing Co. v. IBP, Inc.*, 224 F.3d 1296, 1306 (Fed. Cir. 2000)). Therefore, the Court will apply Rule 12(b)(6) precedent from the United States Court of Appeals for the Third Circuit for purposes of deciding this Motion.

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dir. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab.*

*Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In the context of patent infringement, while "[a] plaintiff is not required to plead infringement on an element-by-element basis," a plaintiff "cannot assert a plausible claim . . . by reciting the claim elements and merely concluding that the accused product has those elements."[7] *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352-53 (Fed. Cir. 2021). Rather, "[t]here must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." *Id.* at 1353. Moreover, while "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . it [is also true] that [s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (cleaned up). Importantly, "[t]he level of detail required in any given case will vary depending upon a number of factors, including the complexity of the technology, the materiality of any given element to practicing the asserted claim(s), and the nature of the allegedly infringing device."[8] *Id.*

## IV. <u>DISCUSSION</u>

FanDuel argues that the '988 patent is patent ineligible pursuant to § 101 because it is

---

[7] "Although the Federal Circuit decided *Bot M8* under the laws of the Ninth Circuit, the Third Circuit's pleading standards are not materially different," and therefore *Bot M8* supplies welcome guidance regarding pleading requirements for patent infringement cases at the motion to dismiss stage. *Lexington Luminance LLC v. Bulbrite Indus., Inc.*, Civ. No. 22-3787, 2023 WL 143911, at *3 n.6 (D.N.J. Jan. 10, 2023) (citing *NovaPlast Corp.*, 2021 WL 5770264, at *6).

[8] For example, in a case involving simple technology "a plaintiff may plausibly plead [infringement] by providing the asserted patents, identifying the accused products 'by name and by attaching photos of the product packaging,' and alleging that the accused products meet 'each and every element of at least one claim . . . either literally or equivalently.'" *ALD Social, LLC v. Verkada, Inc.*, 654 F. Supp. 3d 972, 978 (N.D. Ca. 2023) (quoting *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018)).

directed to an abstract idea. (ECF No. 66-1 at 6; ECF No. 70 at 5.) The Court disagrees and will not invalidate the '988 patent at this early stage in the litigation.

"Patent eligibility, governed by § 101, is evaluated according to Federal Circuit law, and presents 'a question of law, based on underlying facts.'" *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355 (Fed. Cir. 2024) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018)). Pursuant to § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The United States Supreme Court "has long held that this provision contains an important implicit exception." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012). That is, "'[l]aws of nature, natural phenomena, and abstract ideas' are not patentable." *Id.* (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). The concern "driv[ing] this exclusionary principle [is] one of pre-emption." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 573 U.S. 208, 216 (2014). "Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work," and "[m]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* (cleaned up).

Nevertheless, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* (citing *Mayo*, 566 U.S. at 71). Therefore, to aid courts in determining whether patent claims are invalid and unpatentable pursuant to § 101, the Supreme Court has articulated a two-part test (*i.e.*, the *Alice* test). Courts first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 217. If the claims are directed to a patent ineligible concept, like an abstract idea, then courts "consider the elements of

10

each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 78). Step two of this analysis is "a search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (cleaned up).

"Subject matter eligibility under § 101 may be determined at the Rule 12(b)(6) stage of a case."[9] *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019) (citing *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)). This is so "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Id.* Moreover, courts must be mindful that "[u]nder 35 U.S.C. § 282, a granted U.S. patent is afforded a statutory presumption of validity" and that "[t]he presumption of validity applies to all challenges to patentability, including those under [§] 101 and the exceptions thereto." *CBA Env't Servs., Inc. v. Toll Bros. Inc.*, 403 F. Supp. 3d 403, 412 (D.N.J. 2019) (citing 35 U.S.C. § 282(a), and quoting *CLS Bank Int'l v. Alice Corp. Pty*, 717 F.3d 1269, 1304 (Fed. Cir. 2013)).[10] Importantly, the burden of establishing invalidity of a patent or any claim

---

[9]     The Court notes that in some cases it may be prudent to address subject matter eligibility after claim construction. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1274-75 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101. We note, however, that it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter.").

[10]    "Subject-matter eligibility is a matter of law, but underlying facts must be shown by clear and convincing evidence." *Realtime Data LLC v. Array Networks Inc.*, 537 F. Supp. 3d 591, 604 (D. Del. 2021), *aff'd*, Civ. Nos. 21-2251, 21-2291, 2023 WL 4924814 (Fed. Cir. Aug. 2, 2023). Moreover, "[a]t the pleading stage, to the extent the § 101 question of law is informed by subsidiary factual issues, those facts are to be construed in the light most favorable to Plaintiff." *Recentive Analytics, Inc. v. Fox Corp.*, 692 F. Supp. 3d 438, 447 (D. Del. 2023), *aff'd*, 134 F.4th 1205 (Fed. Cir. 2025).

thereof shall rest on the party asserting such invalidity.  *See Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1328 (Fed. Cir. 2020) (noting that the party challenging a patent under § 101 bears the burden of proof).

FanDuel argues that the '988 patent is invalid because it is directed to an abstract idea, thereby satisfying *Alice* step one.  (ECF No. 66-1 at 13-17.)  The Court finds that such a determination is premature at this early stage in the litigation.[11]

"[T]he first-stage filter is a meaningful one, sometimes ending the § 101 inquiry."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016).  Under *Alice* step one, courts consider "whether the claims at issue are directed to patent-ineligible subject matter," like an abstract idea.  *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024).  "This 'directed to' inquiry does more than 'simply ask whether the claims involve a patent-ineligible concept.'"  *Id.* (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)).  Rather, courts "must look to the character of the claims as a whole to determine whether they are 'directed to' patent-ineligible subject matter."  *Id.*  Further, courts must take care not to oversimplify key inventive concepts or downplay an invention's benefits.  *Enfish*, 822 F.3d at 1337-38.

As the Federal Circuit has recognized, courts "often conduct the *Alice* step one inquiry by

---

[11]    The parties dispute whether FanDuel has proven representativeness.  FanDuel asserts that claim 1 of the '988 patent is representative of all 97 claims because "claim 1 recites the representative features of the '988 patent claims."  (ECF No. 66-1 at 13; *see* ECF No. 70 at 5-7.)  Conversely, WinView argues that claim 1 is not representative of all claims and that FanDuel has failed to provide sufficient analysis for this Court to make such a determination.  (ECF No. 69 at 34-35.)  The Court need not resolve this issue for purposes of ruling on Defendant's Motion, because the Court denies the Motion as to claim 1.  *See Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*, 670 F. Supp. 3d 1213, 1225 (D. Kan. 2023) (declining to resolve the representation issue at the motion to dismiss stage because the defendant failed to establish invalidity pursuant to § 101).

examining the 'focus of the claimed advance over the prior art.'" *AI Visualize*, 97 F.4th at 1378

(quoting *Affinity Labs of Tex.*, 838 F.3d at 1257); *see Enfish*, 822 F.3d at 1334 (noting that the

Federal Circuit "and the Supreme Court have found it sufficient to compare claims at issue to those

claims already found to be directed to an abstract idea in previous cases").  Moreover, "[i]n the

realm of computer-related technology, such as in this case, patent claims may be non-abstract at

*Alice* step one if the focus of the claimed advance is on an improvement in computer technologies,

rather than the mere use of computers."  *Id.*; *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299,

1303 (Fed. Cir. 2018).  This means that "[t]he claims must 'focus on a specific means or method

that improves the relevant technology.'" *AI Visualize*, 97 F.4th at 1378 (quoting *McRO, Inc. v.*

*Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)); *Recentive Analytics*, 134

F.4th at 1212 ("In the context of software patents . . ., the step-one inquiry determines whether the

claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a

process that qualifies as an abstract idea for which computers are invoked merely as a tool.")

(cleaned up).

     In support of its position that the '988 patent is directed to an abstract idea, FanDuel

advances two principal arguments: (1) "wagering games, such as the sports games disclosed in the

'988 patent, are an abstract idea, as they compare to 'fundamental economic practices' that are

unpatentable under *Alice* step one"; and (2) technology that manages competitions/games are

directed to an abstract idea.[12]  (ECF No. 66-1 at 14-17.)  In response, WinView asserts that "the

---

[12]    FanDuel also asserts that the '988 patent is unpatentable under the "pen and paper" test.
(ECF No. 66-1 at 14; ECF No. 70 at 11-12.)  "[A] claim whose 'steps can be performed in the
human mind, or by a human using a pen and paper' is directed to an 'unpatentable mental process[
].'"  *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (quoting
*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011)).  WinView
suggests that a human cannot perform the activity covered by the '988 patent.  (ECF No. 69 at 28.)
Conversely, FanDuel asserts that "while it may be quicker and more efficient to use a computer to

'988 patent claims are about a technological solution for better managing simultaneous, real-time games" and that the claims "are not directed to gaming itself." (ECF No. 69 at 22.) Rather, the '988 patent claims "provide a solution 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks,' provide 'specific implementation of a solution to a problem in the software arts,' and provide a 'specific improvement to the way computers operate.'" (*Id.* (first quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014), and then quoting *Enfish*, 822 F.3d at 1336, 1139).) WinView further argues that the '988 patent claims "provide specifically improved and more efficient server devices and user interfaces that allow, among other things, a plurality of users to compete 'simultaneously and in real time' in multiple contests and in which the same event selections are applied 'separately and simultaneously' in real time." (*Id.* at 22-23.)

First, the Court rejects FanDuel's argument that claim 1 is directed to an abstract idea because wagering games are considered "fundamental economic practices," and therefore not patentable under prevailing law. FanDuel is correct that wagering games are considered fundamental economic practices that fall into the category of abstract. *See, e.g.*, *In re Smith*, 815 F.3d 816, 818-19 (Fed. Cir. 2016) (concluding that the "[a]pplicants' claims, directed to rules for conducting a wagering game, compare to other 'fundamental economic practice[s]' found abstract

---

tally and transmit the results, simply relying on the improved speed or efficiency using a computer does not impart patentability." (ECF No. 70 at 11.) Given this dispute, "there is a factual question concerning whether a human can perform with a pen and paper the activity covered by the" '988 patent. *Tobii Tech., Inc. v. Weinblatt*, Civ. No. 20-08062, 2021 WL 3879132, at *5 (D.N.J. Aug. 30, 2021). Like the court in *Tobii*, this Court will not resolve such factual dispute at the motion to dismiss stage. *Id.* at *5; *see also Inmar Brand Solutions, Inc. v. Quotient Tech. Inc.*, 730 F. Supp. 3d 81, 88 (D. Del. 2024) (noting that "just because a 'claimed system achieves automation of a task previously performed by humans . . . does not mean the claimed system is necessarily directed to an abstract idea.'" (quoting *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 643 (Fed. Cir. 2020))).

by the Supreme Court," and that the "[a]pplicants' claimed 'method of conducting a wagering game' is drawn to [the] method of exchanging financial obligations"); *Beteiro*, 104 F.4th at 1356 (noting that the claims were directed to the abstract idea of "exchanging information concerning a bet and allowing or disallowing the bet based on where the user is located").  But, as WinView points out, claim 1 is not directed at wagering games themselves or the rules for wagering games, but rather is directed at technology for "conducting simultaneous multiple contests of skill or chance corresponding to one or more events," which is comprised of both a "storage mechanism" and "application for interacting with the storage mechanism."  (ECF No. 8-4.)  In evaluating the '988 patent in the light most favorable to WinView, the Court is not convinced at this early stage in the litigation that claim 1 is directed at "fundamental economic practices" that would presumably fall within the scope of an abstract idea.

Second, the Court rejects FanDuel's argument that technology that manages competitions/games is directed to an abstract idea.  In support of its argument, FanDuel relies on three cases from the Federal Circuit in which the court found the patent claims abstract under *Alice* step one.  *Planet Bingo, LLC v. VKGS, LLC* involved claims directed at "recit[ing] computer-aided methods and systems for managing the game of bingo" including by "storing a player's preferred sets of bingo numbers; retrieving one such set upon demand, and playing that set; while simultaneously tracking the player's sets, tracking player payments, and verifying winning numbers."  576 F. App'x 1005, 1006 (Fed. Cir. 2014).  The Federal Circuit affirmed the district court's grant of summary judgment on subject matter patentability.  *Id.*  The court explained that "managing the game of bingo consists solely of mental steps which can be carried out by a human using pen and paper" (*i.e.*, reciting the steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and then comparing a winning set of

bingo numbers with a selected set of bingo numbers). *Id.* at 1007-08 (cleaned up). The Court also found that the claims at issue could "be 'carried out in existing computers long in use,' [and could] be 'done mentally.'" *Id.* at 1008 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

In *Electric Power Group, LLC v. Alstom S.A.*, the Federal Circuit held that the patent claims directed at "systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" were directed to an abstract idea. 830 F.3d at 1351. The court determined that the process of collecting, analyzing, and displaying data was simply a "combination of . . . abstract-idea processes" and did not focus on "an improvement in computers as tools," and therefore affirmed the district court's grant of summary judgment. *Id.* at 1351, 1354.

Finally, in *SAP Am., Inc. v. InvestPic, LLC*, the Federal Circuit affirmed the district court's grant of judgment on the pleadings and held that the patent claims directed to "systems and methods for performing certain statistical analyses of investment information" were patent ineligible because the claims were "nothing but a series of mathematical calculations based on selected information and the presentation of the results of those calculations." 898 F.3d at 1163. The court relied on its prior decision in *Electric Power Group* and found that "[t]he focus of the claims . . . is on selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis," which "is all abstract." *Id.* at 1167.

In the cases cited by FanDuel, the overarching theme among the patents at issue is that they were directed towards abstract ideas implemented by various technological means as opposed to modifications or improvements of the technological means themselves. Based on the allegations in the FAC, "[t]he inventions claimed in the '988 [p]atent relate to specific improvements in computer technologies related to distributed gaming and distributed gaming utilizing a mobile

16

device" and "recite new and unconventional solutions . . . rooted in computer technologies." (ECF No. 8 ¶¶ 30, 32.) The improvements involve the use of a server device comprised of a storage mechanism and an application for interacting with the storage device mechanism in order to conduct simultaneous multiple contests of skill or chance corresponding to one or more events. (ECF No. 8-4.) In light of the caselaw outlining the types of technological advancements that are not abstract, the Court finds that claim 1 of the '988 patent is plausibly non-abstract at this early stage of the litigation. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (finding the patent claims not abstract because they were "directed to a particular manner of summarizing and presenting information in electronic devices," which constituted "a specific improvement over prior systems, resulting in an improved user interface for electronic devices"); *Enfish*, 822 F.3d at 1337 (finding the patent claims not abstract because "self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory"); *Finjan*, 879 F.3d at 1299 (finding the patent claims not abstract because the claims directed to a behavior-based virus scanning method "employ[ed] a new kind of file that enable[d] a computer security system to do things it could not do before," and thus operated as "a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large").

While courts, including those in this district, can make § 101 determinations at the motion to dismiss stage, courts are not required to do so. *See Bancorp*, 687 F.3d at 1274-75 (noting that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter"). Importantly, because the '988 patent contains technical subject matter, the Court is unable to effectively evaluate the patent on its face alone,

and therefore it would be inappropriate at this early stage in the litigation to disregard allegations in the FAC about how the patent is an improvement on technology. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (noting that an analysis of "'the language of the [a]sserted [c]laims themselves' [and] the specification" may "require claim construction" or "looking to the specification to understand 'the problem facing the inventor.'" (first quoting *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); then quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016)).

As a result, while FanDuel may be able to succeed in showing that claim 1 of the '988 patent is directed at an abstract concept at a later stage, it would be premature to make that determination at this time. *See Tobii Tech., Inc. v. Weinblatt*, Civ. No. 20-08062, 2021 WL 3879132, at *5 (D.N.J. Aug. 30, 2021) (construing the asserted claims in the light most favorable to the plaintiff and declining to conclude that, at the motion to dismiss stage, the asserted claims are directed to an abstract idea); *Marble Voip*, 670 F. Supp. 3d at 1229 (declining to rule on § 101 challenge at motion to dismiss stage because of the technical subject matter); *Playvuu, Inc. v. Snap, Inc.*, Civ. No. 22-6019, 2022 WL 18359097, at *6-7 (C.D. Ca. Nov. 15, 2022) (declining to resolve the *Alice* step one issue at motion to dismiss stage).[13]

---

[13]    Since the Court finds that FanDuel has failed to satisfy *Alice* step one, the Court need not consider step two. *See Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1378 (Fed. Cir. 2024) ("If the claims are not directed to an abstract idea, the *Alice* inquiry ends.").

## V.    <u>CONCLUSION</u>

For the reasons stated above, and for other good cause shown, Defendant's Motion to

Dismiss (ECF No. 66) is **DENIED**.  An appropriate Order follows.

Dated:  July __10__, 2025

<u>                                        </u>
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

19