Michael J. Gesualdo
ROBINSON MILLER LLC
Ironside Newark
110 Edison Place, Suite 302
Newark, NJ 07102
(973) 690-5400
mgesualdo@rwmlegal.com

Jonathan S. Caplan
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100
jonathan.caplan@hsfkramer.com

*Attorneys for Plaintiff*
WINVIEW IP HOLDINGS, LLC

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| WINVIEW IP HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:21-cv-13807-GC-JTQ |
| v. | ) ) ) | **SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| FANDUEL, INC., a Delaware corporation, FANDUEL GROUP, INC., a Delaware corporation, FANDUEL GROUP PARENT LLC, a Delaware corporation, and BETFAIR INTERACTIVE US LLC, a Delaware corporation, | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## <u>LOCAL CIVIL RULE 10.1 STATEMENT</u>

The address of Plaintiff WinView IP Holdings, LLC ("WinView") is 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.

The address of Defendant FanDuel, Inc. ("FanDuel Inc.") is 1 Racetrack Dr., East Rutherford, New Jersey 07073.

The address of Defendants FanDuel Group, Inc. ("FanDuel Group") and FanDuel Group Parent LLC ("FanDuel Group Parent") is 300 Park Avenue South, New York, NY 10010.

The address of Defendant Betfair Interactive US LLC ("Betfair") is 6701 Center Drive West, Los Angeles, California 90045.

Hereinafter, FanDuel Inc., FanDuel Group, FanDuel Group Parent, and Betfair will be collectively referred to as "Defendants" and "FanDuel."

WinView, by and through its undersigned counsel, complains against FanDuel and alleges as follows:

1.      WinView is seeking to protect its valuable intellectual property from FanDuel's ongoing willful infringement.   WinView developed and patented novel technology that transformed online and mobile gambling.  On multiple occasions, WinView contacted FanDuel to notify it about WinView's patented technology and unique sports skill-based platform, discuss potential partnerships, and attempt to engage FanDuel in a partnership or investment which would exploit WinView's patents and its paid-entry sports betting games of skill.  FanDuel chose to willfully infringe WinView's patents rather than partner with WinView, necessitating this action.

## NATURE OF THIS ACTION

2.      This is an action for patent infringement arising under 28 U.S.C. § 1331 and the United States Patent Act, 35 U.S.C. § 100 *et seq*.  WinView seeks damages and other relief from FanDuel's willful infringement of WinView's asserted patents by its gaming offerings and related mobile applications.

## THE PARTIES

3.      Plaintiff WinView is a limited liability company duly organized and existing under the laws of the State of Delaware.  WinView is located at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.  WinView is a wholly-owned subsidiary of WinView Technology Inc., a corporation organized and existing under the laws of Delaware, headquartered at 7804-C Fairview Road, Suite 207 Charlotte, North Carolina 28226.  WinView Technology, Inc. offers proprietary application platform features including ultra-low latency streaming.  Ex. 10 at 3-4 (https://winviewtechnology.com/about/).

4.      WinView's patent portfolio includes leading technological innovations in mobile gaming and interactive television, covering various aspects of immersive live sports betting and viewing.  WinView's technologies enable the creation of an online and mobile environment that `enhances the sports viewing and gaming experience, making it more engaging and more exciting for customers, while eliminating unfair competitive advantages.  Its technologies enable technical advances which increase FanDuel's customer base and wagering opportunities and enable compliance with state and federal gaming and Daily Fantasy rules and regulations.  Using WinView's patented technology, sports fans across the country can watch sports on television, enter contests, and compete against other fans as the action unfolds, winning cash and other prizes utilizing any Internet-connected device.

5.      WinView's extensive portfolio of United States patents includes U.S. Patent Nos. 10,721,543 and 10,806,988 (collectively, the "Asserted Patents").  WinView is the owner by assignment of all right, title, and interest in the Asserted Patents.

6.      FanDuel is a digital sports entertainment and gaming enterprise.  FanDuel describes itself as an enterprise with a mission to "make sports more exciting."  FanDuel provides users with daily fantasy sports, online sports betting, and casino-style gambling offerings.  FanDuel is also involved in the design, development, and licensing of sports betting and casino gaming software for online and retail sportsbook and casino gaming products.  FanDuel markets, advertises, sells, and offers to sell infringing products, services, and mobile applications through its root website domain fanduel.com, which includes the subdomains fanduel.com, casino.fanduel.com, and sportsbook.fanduel.com.    For  example,  FanDuel  offers  the  FD  Sportsbook  online  at sportsbook.fanduel.com and an FD Sportsbook application for mobile devices.  FanDuel further

3

offers Daily Fantasy Sports online at fanduel.com and a FanDuel Daily Fantasy Sports application for mobile devices.

7.      FanDuel operates through a number of related corporate entities, including FanDuel, Inc., FanDuel Group, FanDuel Group Parent, and Betfair, which are also alter egos of one another, such that FanDuel operates as a consolidated and joint enterprise, and the acts of one Defendant are attributable to the others for purposes of the matters alleged herein.

8.      FanDuel operates with respect to some of the accused offerings under the name "FanDuel" in relevant states.  For example, FanDuel operates sportsbook and casino mobile applications under FanDuel's name.  These include "FanDuel Sportsbook," "The Duel," and "FanDuel Casino."  FanDuel operates under the name "FanDuel Sportsbook" and has registered tradenames, applied and registered for operational license, and is doing business as FanDuel in various states it is allowed to operate.  *See e.g*., Ex. 11 (FD Sportsbook Website including the marking "© Betfair Interactive US LLC, 2025"); Ex. 12 (Colorado Secretary of State website); Ex. 13 (FanDuel's Notice of Intent Regarding License for Sports Wagering for The Massachusetts Gaming     Commission)     (https://massgaming.com/wp-content/uploads/FanDuel-A-Notice-of-Intent-MA.pdf); Ex. 14 (Indiana Gaming Commission's Order approving a settlement agreement listing     "Betfair     Interactive     US,     LLC     d/b/a     FanDuel     Sportsbook.") (https://www.in.gov/igc/files/meetings/2020/2020-60-Order.pdf); Ex. 15 (Betfair Interactive US, LLC's Application for Massachusetts Sports Wagering Operator License ("Massachusetts Application")).

9.      Defendant FanDuel, Inc. is a corporation duly organized and existing under the laws of the State of Delaware having executive offices at 300 Park Avenue South, New York, NY 10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New

Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. FanDuel, Inc. is a wholly-owned, indirect subsidiary of FanDuel Group. FanDuel, Inc. is the licensing and operating company for FanDuel's daily fantasy sports in each state where it operates except for Pennsylvania, where FanDuel operates daily fantasy sports under FanDuel PA LLC.

10. Defendant FanDuel Group is a corporation duly organized and existing under the laws of the State of Delaware having executive offices at 300 Park Avenue South, New York, NY 10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. FanDuel Group is a wholly-owned, direct subsidiary of FanDuel Group Parent. FanDuel Group in its current form was created when Paddy Power Betfair, an Irish gambling company, acquired the predecessor FanDuel and merged FanDuel with its US business, Betfair US. Ex. 16 (Merger Report) (https://paulickreport.com/nl-list/paddy-power-betfair-fanduel-complete-merger-tvg-now-partof-fanduel-group). FanDuel Group exercises complete domination over FanDuel, Inc. and Betfair, such that FanDuel, Inc. and Betfair lack any separate corporate existence and function as mere instrumentalities of FanDuel Group.

11. Defendant FanDuel Group Parent is a corporation duly organized and existing under the laws of the State of Delaware, having executive offices at 300 Park Avenue South, New York, NY 10010 and regular and established places of business at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401. Flutter owns 95.5% of FanDuel Group Parent. Ex. 17 (Flutter 20-F Form) at 81.

12. Defendant Betfair is a corporation duly organized and existing under the laws of the State of Delaware, with a principal place of business located at 6701 Center Drive West, Los Angeles, California 90045. BetFair operates within the state of New Jersey at 525 Washington

5

Boulevard, Jersey City, NJ 07310.  The registered agent of Betfair Interactive US LLC is Corporation Service Company.  The agent office address is 1900 W Littleton Blvd, Littleton, CO 80120.  Betfair Interactive is a wholly-owned, direct subsidiary of FanDuel Group.

13.    Betfair operates and does business under the name "FanDuel."  *See* Ex. 18 (Petition Continue to Conduct Internet Gaming and Sports Wagering in New Jersey) (https://nj.gov/oag/ge/docs/Rulings/2024/sep1_15/C15PTServices.pdf) (listing Golden Nugget and Betfair parties to the PRN 0932401 agreement for casino service industry licensure).  Betfair operates sports and other betting games for FanDuel, through electronic, interactive, and technological means (including the Internet).  Betfair is FanDuel's licensing and operating company for sports betting and Internet gaming in states where FanDuel offers those services.  In accordance with the laws of the State of New Jersey (including, for example, New Jersey Sports Wagering Law, P.L. 2018 at Chapter 33), Betfair maintains both a physical business presence at the casinos with which it operates in the State of New Jersey (e.g., Bally's Atlantic City and Meadowlands Racetrack), and physical equipment in the form of Internet servers, for providing the infringing services to residents of the State of New Jersey.

14.    FanDuel makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including the Internet domains registered and existing at www.sportsbook.fanduel.com and its related state-specific sites, casino.fanduel.com, and mobile applications for Android, iOS, and iPadOS.

## JURISDICTION AND VENUE

15.    This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*  This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

16.     This Court has personal jurisdiction over Defendants because they have availed themselves of the legal protections of the State of New Jersey by, among other things, maintaining a physical presence and regular places of business in New Jersey, conducting business in the State of New Jersey, and engaging in continuous and systematic infringing activities in the District of New Jersey.  *See* Ex. 19 (FanDuel Careers Jersey City) (https://fanduel.careers/offices/jersey-city); Ex. 20 (FanDuel Careers Offices) (https://fanduel.careers/offices).

17.     This Court also has personal jurisdiction over Defendants because they make, use, offer for sale, and sell products and services in the District of New Jersey and have committed and continue to commit acts of infringement in the District of New Jersey.  *See e.g.* Ex. 22 (FanDuel in New Jersey support website indicating that "[w]hile located in New Jersey, you can play with FanDuel in the following ways: Sportsbook, Casino, Fantasy, [and] FanDuel Faceoff") (https://support.fanduel.com/s/article/FanDuel-in-New-Jersey); Ex. 23 (FanDuel Sportsbook NY Website) (https://www.fanduel.com/sportsbook-ny); Ex. 24 at 2 (FD Casino website indicating that FanDuel iGaming is available in New Jersey: "PLAY CASINO GAMES ANYWHERE IN PA, MI, NJ OR WV RIGHT FROM YOUR PHONE ON THE FANDUEL CASINO APP!") (https://www.fanduel.com/casino-search-rf1000).  Further, Defendants derive substantial revenue from their acts of infringement in the District of New Jersey and derive substantial revenue from interstate and international commerce associated with the infringing products.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 35 U.S.C. § 1400(b) at least because FanDuel has committed acts of infringement within this judicial district giving rise to this action and has regular and established places of business in this judicial district, including retail sportsbook locations at 1 Racetrack Drive, East Rutherford, New Jersey 07073 and 1900 Pacific Avenue, Atlantic City, New Jersey 08401.

19.     Defendants are properly joined under 35 U.S.C. § 299(a) because, as set forth in greater detail herein, Plaintiff's right to relief is asserted herein against Defendants jointly, severally, and in the alternative with respect to or arising out of the same transactions, occurrences, and series of transactions and occurrences relating to the making, using, selling, and offering to sell into the United States the same accused products and services, and questions of fact common to all defendants will arise in the action.  Defendants, through their own acts and each through the acts of each other acting as its representative, alter ego, or agent, of each other, commonly and jointly make, use, sell, and offer for sale the same infringing products and services discussed herein.

## WINVIEW'S INNOVATIONS RESULTED IN THE ASSERTED PATENTS

20.     Over a period of more than thirty years and through a series of technologically related startup ventures, Mr. David B. Lockton, the inventor of the Asserted Patents, conceptualized and developed a series of successful pioneering technologies, consumer products, services, and companies.  These ventures culminated in Mr. Lockton's latest venture—WinView. WinView's vision was to revolutionize the paid-entry skill game and sports betting industry by introducing new technologies to enable TV viewers to interact in real time with sports programming and deal with the challenges presented by remote, live, and real-time gaming.  By leveraging mobile technology, WinView's innovations enable users to engage with games of skill and chance in dynamic and interactive ways, solving long-standing challenges in sports and entertainment technology.

21.     The success of WinView's vision is illustrated by the decision of the United States Patent and Trademark Office ("USPTO") to award it with a robust patent portfolio with over 90 patents, covering its novel technologies for distributed, mobile, and on-line gaming.

22.     On July 21, 2020, the USPTO duly and legally issued United States Patent No. 10,721,543 (the "'543 Patent") entitled "Method of and System for Managing Client Resources and Assets for Activities on Computing Devices" to inventors Tim Huske, Mark J. Micheli, Mark K. Berner, Matt Ford, and David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '543 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '543 Patent is attached to this Complaint as Exhibit 1.

23.     On October 20, 2020, the USPTO duly and legally issued United States Patent No. 10,806,988 (the "'988 Patent") entitled "Method of and System for Conducting Multiple Contests of Skill with a Single Performance" to inventor David B. Lockton.  WinView is the owner by assignment of the entire right, title, and interest in and to the '988 Patent, including the right to seek damages and any remedies for past, current, and future infringement thereof.  A true and correct copy of the '988 Patent is attached to this Complaint as Exhibit 2.

24.     The Asserted Patents are patent eligible, valid, and enforceable.  The Asserted Patents disclose and specifically claim non-abstract, inventive concepts representing significant improvements over conventional systems.  Specifically, the Asserted Patents introduce transformative advancements in distributed gaming and mobile technology, including real-time bookmaking, geographic integration, specific solutions to manage simultaneous contest participation, and mechanisms to ensure fairness and compliance with state laws.  These innovations enable dynamic user engagement, optimize system efficiency, and address complex regulatory requirements.

25.     WinView's inventions solved problems in the art because live television-related interactive gaming systems created memory management inefficiencies in user input processes, an

9

inability to ensure compliance with geographic restrictions and provide entertaining experiences while complying with state gaming and skill-game laws, and an inability to prevent unfair advantages arising from television signal propagation delays. Then-available technologies could not manage assets on mobile devices efficiently, hindering user engagement, fairness, and scalability in gaming environments.

26. The Asserted Patents cover distinct combinations of inventive concepts, which were not conventional at the time of the inventions, including the following concepts.

27. **Efficient Management of Assets on a Mobile Device:** The efficient technological management of assets on a mobile device optimizes performance by ensuring that only the necessary assets for specific events are downloaded to users' devices. Previously, users would experience slow loading times and memory shortages when large amounts of unnecessary data were transferred to their devices, which would also slow down the operating speed of the application. This approach solves that problem by determining which assets are already resident on the device and only delivering missing assets in real-time before the event. This reduces data congestion and memory usage, ensuring that users receive the necessary components in a timely manner without overloading their device's resources. For example, during a live sporting event, the graphics, statistics, and multimedia related to that specific game would be sent to the device, minimizing wait times and optimizing the user experience.

28. **Providing the Game During an Event Based on Geographic Location:** The Asserted Patents use location-based filtering to provide game options based on users' geographic locations in order to create a personalized gaming experience. Integrating real-time location data with live event information ensures that users are only presented with games and events that are legally available in their area. This enhances the user experience with mobile applications by

providing only relevant content and ensures gaming companies can limit operation to the states in which they are licensed by ensuring compliance with state and federal regulations. For instance, a user attending a live sporting event might be prompted by the sports betting provider to join a geographically enabled contest directly related to that event, providing a dynamic, location-specific gaming experience that would not be possible without real-time geographic integration.

29. **Efficient Application Memory Management Through Limiting Event Information Based on Geographic Location:** The ability to receive and provide event information from gaming servers whose assets exceeds the memory size of a mobile phone provided in real time based on the user's geographic location represents a significant advancement in mobile computer technology. Prior to this innovation, companies offering legalized mobile and online betting would have to provision their applications with all the information required to interact with hundreds of games offering hundreds of constantly changing betting markets for all potential users in a single application. This made it impossible to deliver the real-time information required by a unique bettor, significantly slowing down the applications' performance. In addition, in most cases this approach would exceed a mobile phone's memory capacity. By integrating real-time location data to filter event information, this invention ensures that users' native applications running on smart phones are only served information for the events legally available in their jurisdiction, reducing memory requirements and enabling necessary speed requirements, while ensuring compliance with applicable state laws. This feature allows for a seamless, immediate, and location-aware user experience, ensuring that the content provided is both fair and legally compliant.

30. **User Input for Group and Event Selections:** The inventions' user-input mechanism for group and event selections represents an efficiency increase in personalized

11

interactive gaming.  Previously, users in Daily Fantasy faced a low probability of winning skill-based open tournaments and Daily Fantasy faced the impossibility of allowing less skilled players the enjoyment of a reasonable chance of winning cash, by conducting potentially millions of simultaneous contests at once, each scored separately and simultaneously.  The inventions' approach allows users to effortlessly select multiple groups and events at once, with inputs tailored to their personal preferences and experience level.  This approach enables contest providers to operate a massive real-time computing system at very low cost, in effect making it possible to operate Daily Fantasy Sports based on common live events.

31.    **Receiving Group Selections by a Device/Server Where Each Group Simultaneously Participates in a Separate Competition**: The simultaneous nature of participation ensures that personalized user selections are registered and managed efficiently, leveraging device/server-side processing for better contest management.  This approach allows users to compete with their selection in multiple contests simultaneously with the same performance and with the same investment of time.  The offering of many different types of contests simultaneously obviates the problem of single open contests of skill consistently won by a handful of extremely skilled professional competitors.  The user experience can further be enhanced by simultaneously scoring user performance.

32.    **Receiving/Triggering a Lockout Signal:** Receiving or triggering a lockout signal ensures the integrity of all gaming based on real-time sporting events by preventing last-minute changes to user inputs that could provide some users with significant competitive advantages, undermining the fairness of competition.  In live betting systems, after an event is underway, latency between an event's occurrence and its broadcast to users could allow some players, such as those attending an event live or observing the event through a television source with lower

12

signal propagation latencies, to gain an unfair advantage by observing the unfolding action earlier. A lockout signal effectively freezes user inputs as soon as the event's relevant actions begin. On the other hand, sports betting companies wish to delay locking out a potential bet unnecessarily early in order to increase their revenues by accepting more wagers. Different sports and game occurrences present a wide variety of the optimal timing of a lockout signal. By adjusting the execution of a lockout signal for the anticipated time until resolution, taking into account the measured difference between the earliest arriving TV signal and a later arriving one, and utilizing a person physically present at a live event to mark the latest time a lockout must be executed by marking the lockout event in real time, this innovation further optimizes the length of the betting window for the book maker. At the same time the method minimizes the impact of latency and ensures an even playing field for all participants. Confidence that no users will have an unfair advantage is critical to providing a fair and attractive remote-gaming experience and in many cases compliance with various laws.

33.    **Determining a Plurality of Competitive Groups Based on Eligibility:** Determining a plurality of competitive groups based on user eligibility represents an advancement in ensuring fairness across multiple contests, allowing competitors to avoid having to compete against much more skilled competition. This process analyzes a range of real-time data—such as users' skill level, geographic location, and eligibility to participate in specific types of contents in order to ensure that users are presented or placed into appropriate competitive groups. By matching users to contests based on these criteria, the system levels the playing field and enhances user engagement by personalizing their gaming experiences.

34.    **Equalizing Latencies in Presenting In-Game Data During a Live Event:** The ability to equalize effects of latency issues in synchronization of the game data presented, with a

13

live event, increases the enjoyment and fairness of games for users. In sports betting, for example, fair competition necessitates that a fast-paced game, based on the unfolding television action, has a level playing field for all participants regardless of how they receive their game feed. Live sports betting, which relies on participation by watching an event on a television, has potential latency issues since, for example, television signal reception is not uniform and there are delays between individuals attending a game and varied amounts of delay for those watching the game live on television. The online broadcast of content depicting what is happening in the sporting event with the synchronized game data constituting, for example, updated odds and propositions, allows games of chance that rely on participation by watching an event and related data displayed simultaneously. Equalizing delays prevents those attending in person or with access to a lower-latency feed from having a competitive advantage.

35.     By disclosing and claiming these and other specific inventive concepts, the Asserted Patents go far beyond just a simple combination of generic components to perform conventional activities. As explained above, the claimed inventions provide technological solutions to address the shortcomings in technology at the time and improve the functionality and capabilities of computers for managing distributed gaming. These inventive concepts provide tangible solutions that address unique challenges in distributed gaming systems, ensuring fairness, compliance, and efficiency.

36.     These inventive concepts were not known in the art, let alone conventional, at the time of the inventions because no existing systems provided mechanisms to dynamically filter event participation based on location, prevent latency-based advantages with real-time lockout signals, or optimize mobile asset management in distributed gaming, among other improvements. These features represent groundbreaking advancements improving, at least, the functionality and

capabilities of computers for managing distributed gaming, which was unavailable in prior art, demonstrating the inventive concepts of the patented claims.

37.    In addition, the claims of the Assert ed Patents are rooted in computer technology covering specific transformative advancements in distributed gaming and mobile technology, improving the computer technology used to operate distributed mobile gaming.  They are specifically directed toward solving challenges in distributed gaming and mobile device technology, such as contest management, event compliance, and system efficiency.  To solve this problem they improve the way servers and mobile devices store and distribute assets needed to operate wagering activities, ameliorating unfair advantages due to varying latency, and allow operation of large-scale games across jurisdictions with varying regulatory regimes.  The inventions address domain-specific problems inherent to on-line gaming systems and mobile devices.

38.    The significance of WinView's patents is illustrated by the fact that they have been cited by subsequently filed patents as relevant art over 253 times, with 49 citations specifically to the Asserted Patents.  Together, the features of the Asserted Patents provide transformative solutions to long-standing challenges in distributed and interactive gaming.

39.    WinView has not licensed any of the Asserted Patents to any third party.  All claims in the '543 Patents are limited to method claims.  In addition, WinView has not offered for sale, sold, or licensed any products that embody any claim of the '988 Patent.  Moreover, Defendants have had actual notice and knowledge of the Asserted Patents, as set forth below.  Thus, WinView's recovery of pre-suit damages for FanDuel's infringement of the Asserted Patents is not limited by 35 U.S.C. § 287(a) as to any Asserted Patent.

15

## FANDUEL'S INFRINGING PRODUCTS

40.     FanDuel's infringing product offerings to consumers include online sports betting through FanDuel Sportsbook & Casino ("FD Sportsbook"), online horse racing through FanDuel Racing ("FD Racing"), and online traditional salary-based fantasy sports through FanDuel Fantasy Sports ("FD Fantasy"), and online casino gaming through the FanDuel Casino ("FD Casino") (collectively, the Accused Products"). Ex. 25 (FanDuel website: "SPORTSBOOK: Bet on all your favorite sports," "CASINO: Play all your favorite table games and slots," "FANTASY: Draft a winning team every week") (https://www.fanduel.com/). FanDuel makes, uses, sells, and offers for sale the Accused Products, which practice the claims of the Asserted Patents.

41.     Prior to the formation of FanDuel Group in 2018 by the merger between FanDuel's predecessor entity and Paddy Power Betfair's US, FanDuel's primary products were FD Fantasy and FD Racing. Following the merger, FanDuel began offering its FD Sportsbook products. States including New Jersey have allowed sportsbook offerings, which now account for a rapidly growing proportion of FanDuel's users and revenue growth. *See, e.g.*, Ex. 26 (FanDuel's NJ Sportsbook Opening Report) (https://www.espn.com/sports-betting/story/_/id/24077347/fanduel-open-sportsbook-meadowlands-racetrack-new-jersey); Ex. 27 (FanDuel Group 2018 Results) ("With proven consumer demand and tremendous market opportunity, our first year since the merger of FanDuel and Betfair US has been an incredible success.") (https://press.fanduel.com/press-releases/fanduel-group-2018-results-highlight-strategic-strength-media-advisory). After the merger, FanDuel also launched its FD Casino offerings.

42.     FanDuel has a large presence in the United States. While FanDuel launched its first mobile sportsbook in New Jersey, FanDuel has expanded its geographic footprint and currently offers its mobile and retail sportsbooks in twenty-six states, including Arizona, Colorado,

16

Connecticut, Washington DC, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, Wyoming, Mississippi (retail only), Nevada (retail only), and Washington (online and retail only). *See, e.g.,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map). FD Fantasy is available in most states. *See* Ex. 21 (Flutter 10-K) at 14. FD Casino is available in Connecticut, New Jersey, Pennsylvania, Michigan, and West Virginia. *See id.* at 13.

43. Under some states' sports betting and iGaming laws, online sports betting and iGaming licenses are tethered to a finite number of specifically defined businesses that are deemed eligible for a gaming license, such as land-based casinos, tribes, professional sports franchises and arenas and horse racing tracks, each of which is entitled to a "skin" or multiple "skins" under that state's law. *See* Ex. 21 (Flutter 10-K) at 13. A "skin" permits that license holder to partner with an online operator like FanDuel to offer online sports betting or iGaming services under that entity's license. FanDuel currently relies on skins tethered to land-based casinos, tribes, professional sports franchises, and arenas and horse racing tracks in order to access a number of markets through a skin. *See id.* In other markets, FanDuel may obtain a license to offer online sports betting and iGaming through a direct license offered by the state, which in some cases may be subject to a competitive application process for a limited number of licenses. *See id.* at 13.

44. FanDuel has a strategic partnership with Boyd Gaming. This partnership provides FanDuel with access to online sports betting and iGaming markets in certain states through the use of the first skin granted by a state to a land-based gaming entity with an existing license. *See* Ex. 21 (Flutter 10-K) at 32.

17

45.     While FanDuel has physical locations via its partnerships, most of its customers use the Accused Products via its online platforms.  *See* Ex. 21 (Flutter 10-K) at 136.  FanDuel offers the Accused Products on Apple iOS and iPadOS via Apple's App Store and on Android via Google's Play Store.  FanDuel also provides download links for the Accused Products' apps on its website.  *See* Ex. 11 at 12 (https://sportsbook.fanduel.com/).

**FANDUEL GROUP SITES**
FanDuel Fantasy
FanDuel Racing
FanDuel Casino
TVG
FanDuel Research
FanDuel TV
FanDuel Faceoff

**FANDUEL APPS**
Fantasy (iOS)
Fantasy (Android)
Sportsbook (iOS)
Sportsbook (Android)

Ex. 11 at 12 (links for FanDuel Apps download and installation through the Apple App Store and Google Play Store, available on the FD Sportsbook website) (https://sportsbook.fanduel.com/).

18





Screenshot of FD Fantasy app in Apple's App Store.

Screenshot of FD Sportsbook app in Apple's App Store.



Screenshot of FD Casino app in Apple's App Store.

46.     In addition to its mobile app offerings, FanDuel offers the Accused Products via traditional and mobile websites.  Ex. 21 (Flutter 10-K) at 43 ("Our online product offerings are delivered as free applications through third-party platforms and are also accessible via mobile and traditional websites.").

20



Ex. 11 (FD Sportsbook website) (https://sportsbook.fanduel.com/).



Ex. 29 (FD Casino Website) (https://casino.fanduel.com/).



Ex. 30 (FD Racing website) (https://racing.fanduel.com/).

47.     FanDuel also operates FanDuel retail sportsbook locations in states that authorize retail sports wagering in licensed brick-and-mortar facilities.  Ex. 21 (Flutter 10-K) at 13.



22

Photograph of a FanDuel kiosk at a brick-and-mortar establishment.

48.    FanDuel operates servers within each state from which it offers the Accused Products, as it is generally required to by state laws and regulations. *See, e.g.*, N.Y. PML § 1367-A(h)-(i) ("The server or other equipment which is used by a mobile sports wagering licensee to accept mobile sports wagering shall be physically located in the licensed gaming facility"); N.J.S.A §§ 5:12A-11(a); 5:20-2(c) ("all equipment used by the holder of the permit, including computers and servers, to conduct fantasy sports activities shall be physically located within the boundaries of" a restricted area on the premises of the casino hotel or in another facility owned or leased by the casino licensee . . . that is secure, inaccessible to the public N.J.S.A § 5:12-95.22; 68 IAC 27-6-2 ("A sports wagering operator must locate a server in the state of Indiana."). FanDuel's servers communicate with customers' devices operating the Accused Products, such as mobile phones, tablets, and laptops.

49.    In order to ensure compliance with applicable state laws and provide users with correct permissions information, the Accused Products use GeoComply to monitor the location of the devices using the Accused Products.

**WHERE CAN I DOWNLOAD THE FANDUEL GEOCOMPLY PLUGIN?**

If you're using the **FanDuel apps or on mobile web**, start here for more location troubleshooting tips.

When using the FanDuel Sportsbook website **on your desktop**, you'll need to download the GeoComply plugin for us to locate you. Find your operating system and state here:

Windows plugins
Apple Mac plugins

Ex. 31 (https://support.fanduel.com/s/article/Where-Can-I-Download-the-GeoComply-Plugin).

50.     GeoComply provides geolocation solutions to FanDuel.  *See, e.g.*, Ex. 15 (Massachusetts Application) at 85 ("FanDuel utilizes the GeoComply geolocation security system."); *see also* Ex. 33 (GeoComply Overview) at 4, 9, 12 .

51.     GeoComply is available on mobile phones, tablets, and laptop computers and "occurs seamlessly in the background during the customer's session, without any intrusion to the overall user flow/experience."  Ex. 33 (GeoComply Overview) at 12.



*Id.* at 9.



### GEOCOMPLY

## DOWNLOAD

**MOBILE & DESKTOP SDK**

GeoComply's core compliance product is designed for bundling into a downloadable desktop or mobile client application. This solution is ideal for app-based products requiring the most stringent location compliance capabilities. The geolocation thus occurs seamlessly in the background during the customer's session, without any intrusion to the overall user flow/experience.

**"GOLD-STANDARD" LOCATION COMPLIANCE FOR U.S. REGULATED MARKETS**

GeoComply's download solution is designed to meet and exceed the most stringent compliance requirements for regulated markets. It is considered the gold-standard for withstanding the demands of US federal or state level gaming legislation and is constantly tested by regulatory agencies in jurisdictions such as New Jersey, Nevada, Delaware, West Virginia and Georgia to ensure its continued performance for location compliance.

**PRODUCT FEATURES**

- Comply with US federal regulations including UIGEA, IGRA and Wire Act concerns

- Ideal for highly regulated industries such as iGaming, iLottery and sports betting

- Locate users with 350+ location checks

- Eliminate location fraud with 4200+ spoofing checks

- Bundle into a client app or browser



*Id.* at 12.

52.    FanDuel uses GPS, cellular, and Wi-Fi location services to determine the location of a device.  For example, FanDuel notes in its FAQs that "[o]ur location systems require Wi-Fi, GPS, or GSM signals to locate [a user]."  Ex. 34 (FanDuel Location Troubleshooting Tips) at 2 (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

53.    FanDuel ensures compliance with local laws regarding online sport betting, daily fantasy, and casinos because these types of games are not allowed in every state.  If customers' devices are not in a permitted jurisdiction, FanDuel prevents those customers from placing bets on the FanDuel apps and websites and informs the customers that they appear to be located in a state where betting on FanDuel is not available.  In order to ensure compliance with different state laws

and provide users with correct permission information, the Accused Products' applications and website are configured to monitor the locations of the devices being used to access the services. *See e.g.*, Ex. 35 (FanDuel House Rules Hub) ("Each state, commonwealth, or province have specific regulations on sports betting, horse racing, daily fantasy, and casino games.") (https://support.fanduel.com/s/article/FanDuel-House-Rules-Hub); *see also* Ex. 36 (Bracket Betting State Guidelines) (https://www.fanduel.com/collegerules); Ex. 37 (FD Sportsbook Privacy Policy) at 5 ("Our Services use precise location-based services in order to locate you so we may verify your location, . . . share your location with our vendors as part of the location-based services we offer, and for purposes of legal and regulatory compliance.") (https://www.fanduel.com/fanduel-sportsbook-privacy-policy).

### A. FD Sportsbook

54. In May 2018, the U.S. Supreme Court struck down as unconstitutional the Professional and Amateur Sports Protection Act of 1992. This decision lifted federal restrictions on sports betting and allowed states to determine for themselves the legality of sports betting. Since this decision, thirty-five states have legalized some form of online sports betting and sports betting is on the rise.

55. Since FanDuel launched FD Sportsbook in 2018, states including New Jersey that have approved mobile Sportsbook offerings have accounted for a rapidly growing proportion of FanDuel's users, which has contributed to FanDuel's revenue growth.

56. FanDuel launched its first mobile sportsbook in the United States in New Jersey. FanDuel has expanded its geographic footprint and currently offers its mobile and retail sportsbooks in Arizona, Colorado, Connecticut, Washington DC, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, Vermont, West Virginia, Wyoming,

26

Mississippi (retail only), Nevada (retail only), and Washington (online and retail only).  *See, e.g.,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map).

57.    FD Sportsbook's website and mobile applications only allow customers to place bets if they are in certain states.  *See, e.g.*, Ex. 15 (Massachusetts Application) at 85 ("FanDuel utilizes the GeoComply geolocation security system . . . . FanDuel will only accept wagers on its mobile sports wagering platform from users who are successfully geolocated within the Commonwealth of Massachusetts."); *id* at 87 ("GeoComply is licensed by the relevant gaming regulator in all jurisdictions in which FanDuel operates a mobile sports wagering platform.  The integration between GeoComply's software and FanDuel's mobile sports wagering platform is tested and verified by an independent testing laboratory before FanDuel launches its mobile sports wagering platform in a given state."); *see, also,* Ex. 28 (FanDuel Sports Betting US Map) (https://www.fanduel.com/legal-sports-betting-us-map); Ex. 37 (FD Sportsbook Privacy Policy) at 5 ("Our Services use precise location-based services in order to locate you so we may verify your location,  . . . deliver you relevant content and ads based on your location, share your location with our vendors as part of the location-based services we offer, and for purposes of legal and regulatory compliance.") (https://www.fanduel.com/fanduel-sportsbook-privacy-policy).

58.    Customers    can    access    FD    Sportsbook    online    at https://sportsbook.fanduel.com/sports and with the FD Sportsbook application for mobile devices, which is available for download and installation through the Apple App Store and Google Play Store in certain states.

59.    Sports betting is an increasingly popular way to engage consumers in their sports viewing experience and increase their entertainment.  Sports betting involves a user placing a bet by wagering money at some fixed odds.  The matter on which the user bets is often referred to as

a "proposition" or "prop."  If the user wins, FanDuel pays out the bet.  FanDuel generates revenue from the difference between the payouts and the settled handle for bets that FanDuel has taken.

60.    The propositions that FanDuel offers are based on particular sporting events that occur during the year, such as NFL football, NBA basketball, and MLB baseball games.

**Legal Sports Betting Online with FanDuel Sportsbook**

Welcome to FanDuel Sportsbook, where you can find the best sports betting odds for all of your favorite sports and events. **Whether you're looking to place a bet on NFL, NBA, NHL, MLB, college sports, or any other competition, use America and Canada's number one legal online sportsbook!** We offer the largest selection of betting options, including moneylines, point spreads, over/unders, prop bets, futures bets, parlays, and more. We also offer live betting, allowing you to place bets while a game in progress. Mobile betting is available for legalized online sports betting with the FanDuel Sportsbook and Casino betting app, available on Apple and Android. Check around for odds that interest you and good luck with your bets!

**Why is FanDuel the Best Online Sportsbook?**

**Safe and Secure Sports Betting**: We are the #1 regulated online sports betting platform in the United States
**Best Sportsbook Promos, Bonuses, and Odds Boosts**: Get in on the sports betting action with our customer promotions, such as No Sweat First Bets and Odds Boosts on select sports events.
**Faster Payouts**: You will receive your winnings in as little as 24 hours
**Mobile App and User Interface**: FanDuel Sportsbook has an intuitive and user-friendly interface that makes it easy for users to navigate and place bets. Our mobile app is highly rated and available for both iOS and Android devices, making it convenient for sports bettors to place bets on-the-go.
**Live Betting**: FanDuel Sportsbook offers live in-play betting options, allowing users to place bets during games and events. Customers can also follow along in the app with real-time updates on scores, game statistics, and odds, ensuring that bettors have the most up-to-date information available to make informed decisions.
**More Ways to Win**: Bet our Same Game Parlays, moneylines, teasers, futures bets, partial game odds, prop bets, and more ways to legally place bets!

Ex. 11 at 11 (FD Sportsbook website) (https://sportsbook.fanduel.com/).

61.    FD Sportsbook offers betting propositions that include traditional bets based on end-of-game outcomes, such as who will win a particular game or whether a team will win by more than a certain number of points.  FD Sportsbook also offers "Live" betting propositions that are made during games and as the action unfolds.  Live betting is a significant feature of the FD Sportsbook, designed to increase user engagement, enhance the sports betting experience, and encourage customers to place more wagers.

62.    FD Sportsbook allows users to make wagers while the live sporting event is being played.  Ex. 15 (Massachusetts Application) at 13 ("FanDuel has a market leading live streaming offering that allows customers to watch and wager on their favorite events.").

28

63.    FD Sportsbook offers "the ability to wager in-play with odds changing as the action unfolds . . . Users may wager on a wide range of markets while events are in-play, including game lines, player props, quarters, and half betting.  The platform's in-play offering is further enhanced by providing users the ability to track the action for each game (game trackers) as well as live scoreboards and play-by-plays." Ex. 15 (Massachusetts Application) at 37.

64.    FD Sportsbook "includes integrations with third party content providers (e.g., SportsRadar, IMG and Perform) to offer users the ability to live stream video of games on the mobile sports wagering platform.  This includes select NHL games, select MLB games, tennis, soccer and table tennis." Ex. 15 (Massachusetts Application) at 38.

65.    FD Sportsbook's "bet tracking flow is divided into several parts, including a flow that feeds into 'My Bets,' where users can see their open bets.  Another important aspect of the bet tracking flow is feeding wagers into the cash out system.  On the 'My Bets' page, users can view the live score, cash out offer and even the individual match statistics on the player prop they have placed." Ex. 15 (Massachusetts Application) at 38.

66.    The FD Sportsbook displays a "Live Now" prompt indicating sporting events that are underway.  When the "Live Now" prompt is selected, the FD Sportsbook provides the details regarding the "Live" sporting events along with betting propositions for the event.

67.    FD Sportsbook offers in-game betting propositions for various live sporting events, such as tennis.  For example, FanDuel offers "Point-by-Point" propositions during tennis matches.  In these propositions, FanDuel provides odds on which player will win the next point (or the next game).  Customers select a particular outcome and enter an amount of the wager on the selected outcome.  Customers in jurisdictions where such betting is permitted will be able to place bets on the propositions.

29

68. As the action unfolds relating to a particular betting proposition, the FD Sportsbook website and app provide customers with updated odds for betting propositions. FD Sportsbook also presents the odds and betting propositions synchronized to virtual representations of the sporting event, such as a depiction of a tennis court that depicts the game action.

69. FD Sportsbook prevents customers from betting on propositions when they are no longer permitted to do so. For example, FanDuel sends lockout signals to prevent customers from placing untimely wagers, and may vary the timing of the lockout signal based on the sport involved, the nature of the proposition, and the customers' latency in viewing the underlying game in order to maximize the time period that wagers are accepted to increase revenue while preventing customers from easily cheating by betting after they know the result. When customers are no longer permitted to wager on a particular outcome, the displayed choices for the particular wager are closed (or removed from the interface), and the user is prevented from submitting the locked-out selection. FanDuel's appropriate timing of these lockout signals levels the playing field and increases user engagement, while preventing participants from obtaining information that could give them a material advantage in their betting on the proposition.

## B. FD Racing

70. FanDuel markets, advertises, sells, and offers to sell FD Racing, including through fanduel.com, racing.fanduel.com, Apple's App Store, and Google's Play Store. Below is a screenshot of the FD Racing app on Apple's App Store:



Screenshot of FD Racing app on Apple's App Store.

71. In addition to FD Fantasy and FD Sportsbook, FanDuel expanded into the online horse racing market with FD Racing. While FD Racing offers betting on horse races and the FD Sportsbook offers betting on other sporting events, for purposes of infringement, the relevant functionality in FD Racing, FD Sportsbook, and FD Casino is the same.

72. FD Racing is an iGaming service that is available for use in Arizona, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Mexico, New York, Washington, Oregon, California, Colorado, Wyoming, Idaho, Montana, North Dakota, South Dakota, Arkansas, Louisiana, Indiana, Michigan, Ohio, Kentucky, West Virginia, Virginia, Pennsylvania, Delaware, New Hampshire,

31

Connecticut, Rhode Island and Florida.  *See* Ex. 38 (Where is FD Racing Legal webpage) (https://support.fanduel.com/s/article/State-Specific-Rule).  Below is a screenshot showing that FD Racing will block customers from placing bets on horse races if they are not located within a jurisdiction where the service is legal:



Screenshot of FD Racing App requiring the user's precise location.

73.    FD Racing allows users to bet on horse racing and live stream the races.  FD Racing covers a wide variety of horse racing events, including, but not limited to, the Kentucky Derby, Preakness Stakes, and Belmont Stakes.  Below is a screenshot of an example of races available to a user for betting:



Screenshot of races available for betting on FD Racing app.

33

74.     FD Racing allows customers to place various types of wagers including win, place, show, any combination of these three wagers, exacta, trifecta, superfecta, daily double, pick-3, and pick-5.  Below is a screenshot of an example of the bets available for a race on FD Racing:



Screenshot of bets available on FD Racing app.

75.     Below is a screenshot of the FD Racing website:

34



Ex. 30 (screenshot of FD Racing website) (https://racing.fanduel.com/).

### C.   FD Fantasy

76.   FD Fantasy is a platform offering fantasy sports contests and fantasy sports tournaments which enables players to use their skill and knowledge of relevant professional sports information and the fantasy sports rules to compete against one another for prizes announced in advance of the event.  *See* Ex. 21 (Flutter 10-K) at 132.

77.   FanDuel offers FD Fantasy online at https://www.fanduel.com/contests and on applications for mobile devices, which can be downloaded and installed through the Apple App Store and Google Play Store.  FanDuel provides download links for the FD Fantasy apps on its website.  Ex. 11 (https://sportsbook.fanduel.com/).



Ex. 11 at 12 (links for FanDuel Apps download and installation through the Apple App Store and Google Play Store, available on the FD Sportsbook website) (https://sportsbook.fanduel.com/).



Screenshot of FD Fantasy app on the Apple App Store.

78.     FD Fantasy is currently available in all states except Arizona, Hawaii, Idaho, Louisiana, Montana, Nevada, and Washington. FD Fantasy "offers paid-entry contests in 44 states and the District of Columbia (and free-to-play contests in all 50 U.S. states and the District of Columbia) based on the state laws governing fantasy sports in those individual jurisdictions." Ex. 21 (Flutter 10-K) at 14.

79.     FanDuel offers various types of daily fantasy sports contests that authorize users to choose a contest with an entry fee, pick their team, and try to win by scoring the most points. FD Fantasy includes contests based on the real-life statistics generated in a wide variety of sports, such as NBA basketball, MLB baseball, and NHL Hockey. FD Fantasy also allows users to create their own contests where they specify the entry fee and other contest parameters and FanDuel then offers the contest to other customers. In this and other ways, users are then matched in contests to compete against one another for the entry-fee dollar amounts according to each contest's payout rules (or against one another in head-to-head contests).

80.     FanDuel monitors multiple games and game events on which play is based. FD Fantasy generates statistics on various game events, determines outcomes for each contest, and then pays out awards to the winners based on each contest's payout rules. *See, e.g.*, Ex. 40 (https://www.fanduel.com/how-it-works).

81.     To increase user participation and corresponding fantasy revenue, FanDuel recommends contests for users to join and provides functionality for users to enter their lineups quickly in multiple contests. For example, FanDuel recommends contests and instructs users to "enter one lineup into multiple contests — or, enter one lineup into the same contest multiple

37

times." Ex. 32 at 1 (What's New: Advanced Entry) (https://www.fanduel.com/advanced-entry).

FanDuel also allows users to easily enter an already created lineup into additional contests.



Screenshot of the Sportsbook & Casino App showing lineups.

### D.     FD Casino

82.     FanDuel's iGaming offerings, including FD Casino, are available in Connecticut, Michigan, New Jersey, Pennsylvania, and West Virginia.  *See* Ex. 21 (Flutter 10-K) at 13.  FD Casino allows customers to bet on a range of games of chance, including casino games such as

blackjack, roulette, and slot machines as well as bingo and machine-gaming terminals. *See id.* at 5. FanDuel also offers player vs. player games, such as poker and rummy. *See id.*

83. FanDuel generates revenue through the gross bets placed less payouts on winning bets, which is also referred to as "hold." Individual online games are designed and function in such a manner that FanDuel expects to realize a net win from the aggregation of all the individual gaming transactions with a player over the relationship based on statistical probabilities. *See* Ex. 21 (Flutter 10-K) at 130.

84. FanDuel offers online poker as a peer-to-peer game via several platforms. Players can compete in ring games, where they bet cash equivalents on each hand and each hand has a winner and is paid out. Players can also compete in tournaments where they pay an entry fee and play with tournament chips, with prize money distributed to the last remaining competitors. FanDuel collects a portion of the players' wagers, known as the rake, up to a capped amount in ring games and a tournament entry fee for tournaments. *See* Ex. 21 (Flutter 10-K) at 131.

**E.** **FanDuel's Marketing and Customer Support**

85. FanDuel encourages it customers to use the Accused Products in the United States by providing new and existing customer promotions and incentives. *See e.g.*, Ex. 41 (https://sportsbook.fanduel.com/promotions). FanDuel utilizes a variety of marketing channels, including paid external advertising through traditional and digital media, new player and event driven promotions, paid affiliate programs, social media advertisements, sponsored content, in-casino advertisements, billboards, and its websites. *See* Ex. 21 (Flutter 10-K) at 8.



Photos of FD Sportsbook billboards.

86. FanDuel also relies on successful cross-promotion across its product offerings and has consequently developed ways to minimize friction between its offerings in order to encourage customers to move from one product to another. For example, FD Sportsbook features an embedded iGaming offering in states where iGaming is permissible so that players can play a subset of casino games without leaving the FD Sportsbook app.

87. The photographs below illustrate FanDuel advertising and offering promotions for its FD Casino offering inside of its retail FD Sportsbook location. Specifically, FanDuel offers customers $1,000 back for their losses and 350 bonus spins for its Cash Eruption game.



40

88.    In addition to traditional marketing channels, FanDuel uses media, sports, and entertainment partnerships to promote customer usage of the Accused Products.  *See* Ex. 21 (Flutter 10-K) at 8.  FanDuel enters into exclusive relationships with athletes and celebrities in order to promote the Accused Products.  *See id.*  FanDuel is also (i) an official sports betting partner, official sportsbook, official one-day fantasy partner, official one-day fantasy game, official marketing partner, and authorized gaming operator of the NBA; (ii) an official sponsor/partner, official sportsbook sponsor/partner, official sports betting sponsor/partner and official free to play sponsor/partner of the NFL; (iii) an official sports betting sponsor/partner of MLB; (iv) an official sports betting/wagering partner, official daily fantasy game, official daily fantasy hockey game, official daily fantasy partner, official fantasy partner, and official partner of the NHL; (v) an official sportsbook, official daily fantasy partner, official marketing partner, official partner, and authorized gaming operator of the WNBA; (vi) an official betting operator of the PGA Tour; (vii) an authorized gaming operator of the WTA; (viii) an authorized gaming operator of NASCAR; and (ix) an authorized gaming operator of MLS.  FanDuel also has partnerships with 19 professional teams across these and other leagues.  While the nature of these partnerships varies, each of these relationships helps FanDuel acquire and retain customers more efficiently by, for example, allowing FanDuel to open a retail sportsbook location in their arena, prominently displaying FanDuel's brand on signs throughout their arena, advertising its products across their television, digital media, and radio outlets, and giving FanDuel access to their customer relationship databases for marketing purposes.  *See* Ex. 21 (Flutter 10-K) at 8.

89.    FanDuel offers a compelling set of promotional offers to engage and retain customers:

|  | Bet $X Get $Y | No Sweat First Bet | Refer a Friend | VIP Deposit Match |
|---|---|---|---|---|
| Eligibility | All new users EXCEPT for pre-live users | Users placing their first real money bet with FD Sportsbook | A referred user must be new to FD Sportsbook, but a referring user can be any user | DFS and other local VIP users invited by FanDuel |
| Description | All users who have not received a pre-live registration bonus will have the opportunity to bet a small amount $X to win a much larger amount $Y (e.g., $5 and $150), even if the bet they place loses | If a user's first real money bet with FD Sportsbook settles as a loss, the user will receive their stake back in free bets up to $X in value | Users can invite their friends to register with FD Sportsbook through an exclusive referral link. Once a referred user creates an account, deposits, and places a real money bet of $10 or more, both users unlock $X worth of free bets | VIP users identified by FanDuel will receive the opportunity to make a deposit into their FD Sportsbook account that will be 100% matched by FanDuel |

Ex. 15 (Massachusetts Application) at 70 ("FanDuel also fosters customer loyalty through extensive use of early life and in-life generosity programs designed to incentivize customers to return to the platform.").



*Id.* at 12 (showing examples of promotions offered to customers).

90.     The following are examples of marketing and advertising materials that FanDuel used to promote its launches in Kansas and Ohio.





43





Ex. 15 (Massachusetts Application) at 77-78.



### F.    FanDuel's Use of AWS Services

91.    In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of the Accused Products and to increase its customers' usage of the Accused Products and, thereby, increase FanDuel's revenues.  Ex. 42 (FanDuel describing its technology approach

44

for large scale events that see lots of traffic like the Super Bowl: "To maintain compliance, we utilise a combination of in-state hybrid cloud solutions and traditional AWS cloud offerings, resulting in a unique production environment for each state in which FanDuel operates.") (https://medium.com/fanduel-life/how-does-fanduel-technology-win-the-super-bowl-5febde9be002).    Specifically, FanDuel uses AWS as its strategic cloud provider.    Ex. 43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategic-cloud-provider). FanDuel uses AWS' Lambda function as a service.  Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.") (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel-4505e7ca283c). Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda.  *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).

45



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

92.     As shown in the screenshot below, Amazon's FanDuel case study also confirms its use of AWS.



Ex. 48 at 1, 3-4, 6 (https://aws.amazon.com/solutions/case-studies/fanduel-case-study/) ("Sports gaming company FanDuel Group (FanDuel) operates in a complex regulatory landscape, where every bet must be processed within state lines. This had the potential to slow the company's expansion across the United States, requiring months of setup time and a significant infrastructure investment for each new state. However, FanDuel found a way to overcome this challenge by using Amazon Web Services (AWS). By adopting AWS hybrid cloud services, the company set up new operations at a faster pace, accelerating its expansion into new states.").

93.    AWS' Customer Agreement provides that FanDuel is responsible for and controls its use of AWS' servers:

- "[FanDuel is] responsible for [its] Content. [FanDuel] will ensure that [its] Content and [its] and End Users' use of [its] Content or the Services will not violate any of the Policies or any applicable law."

- "[FanDuel is] responsible for properly configuring and using the Services and otherwise taking appropriate action to secure, protect and backup your accounts and [its] Content in

47

a manner that will provide appropriate security and protection, which might include use of encryption to protect [its] Content from unauthorized access and routinely archiving [its] Content."

- "[FanDuel] will be deemed to have taken any action that [it] permit, assist or facilitate any person or entity to take related to this Agreement, [its] Content or use of the Services. [FanDuel is] responsible for End Users' use of [its] Content and the Services, and for their compliance with [its] obligations under this Agreement."

- "[Amazon] do[es] not provide any support or services to End Users unless [FanDuel and Amazon] have a separate agreement with [FanDuel] or an End User obligating [Amazon] to provide such support or services."

Ex. 45 at 1-2 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

94.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment.  [AWS] do not access or use [FanDuel'] content for any purpose without [its] agreement.  Ex. 46 at 1 (Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

## **FANDUEL'S INFRINGEMENT OF WINVIEW'S PATENTS**

95.    FanDuel has infringed and continue to infringe one or more claims of each of the Asserted Patents by engaging in acts that constitute infringement under 35 U.S.C. § 271, including but not necessarily limited to making, using, selling, and offering for sale, within this District and elsewhere in the United States, without authority or license, FanDuel products and services falling within the scope of one or more claims of the Asserted Patents.

96.     In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), literally and under the doctrine of equivalents, FanDuel indirectly infringes all the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), literally or under the doctrine of equivalents.

97.     In addition to directly infringing the Asserted Patents pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, FanDuel indirectly infringes the Asserted Patents under 35 U.S.C. §§ 271(b) and (c), literally or under the doctrine of equivalents.

98.     As discussed above, FanDuel induces infringement of the Asserted Patents by instructing, directing, and requiring others, including its customers, purchasers, users, and developers, to meet claim elements of the Asserted Patents, literally or under the doctrine of equivalents.

99.     FanDuel contributorily infringes the Asserted Patents by making and supplying products that are components in an infringing system with components from manufacturers, customers, purchasers, users, and developers that together meet all claim elements in the Asserted Patents, literally or under the doctrine of equivalents.

## FANDUEL'S KNOWLEDGE OF WINVIEW'S ASSERTED PATENTS

100.    As set forth below, FanDuel had pre-suit knowledge of the Asserted Patents and that its Accused Products infringe the Asserted Patents.  At the very least, FanDuel is aware of the Asserted Patents and of its Accused Products' infringement of the Asserted Patents from its receipt of WinView's original Complaint, First Amended Complaint, and this Second Amended Complaint.

101.    WinView Inc., the previous holder of the Asserted Patents, widely disclosed the Asserted Patents giving notice of them to FanDuel and other participants in the online gaming industry.  At least as early as December 2015, WinView Inc. identified its patents on the

49

intellectual property page of its website. Ex. 47 (Archive.org web capture) (https://web.archive.org/web/20151207111054/http:/www.winviewgames.com/about/intellectual -property/). WinView Inc. regularly updated this website, disclosing the Asserted Patents as they issued.

102. WinView Inc. issued publicly available statements and press releases, including on its website, disclosing its patents and stating that, among other things, its "portfolio of [] foundational patents covers the synchronization of the second-screen with TV broadcasts and commercials and the optimum methods of monetizing sports-based games of skill, among other types of programming content." Ex. 78 at 4.

103. WinView's patents were known in the industry and have been cited by subsequently filed patents as relevant art over 253 times, with 49 citations specifically to the Asserted Patents.

104. FanDuel was well aware of WinView Inc. and of its technology and patents, long before WinView filed this case. As an entity that conducts significant market research, FanDuel learned of WinView's patents and technology from WinView's above-described disclosure efforts.

105. In addition, FanDuel was familiar with, and had direct knowledge of, WinView Inc. as early as 2017. In early 2017, David Lockton, WinView's Founder, President, and CEO contacted Nigel Eccles, who was FanDuel's CEO and Co-founder at the time, through a consultant. Mr. Lockton contacted Mr. Eccles in order to arrange a discussion on the synergism between WinView Inc. and its patent portfolio and pioneering paid entry skill game experience and FanDuel. Following up, Mr. Lockton introduced Mr. Eccles to Tom Rogers, the Executive Chairman of WinView Inc. This introduction progressed to an email exchange between Mr. Eccles

and Mr. Rogers, where Mr. Eccles acknowledged there were "[l]ots of similar interests here" and invited Mr. Rogers to coffee to meet to discuss WinView and its technology.

106.    Mr. Eccles left FanDuel in November of 2017, and Mr. Lockton contacted FanDuel's new CEO, Matt King, also through a consultant.  Mr. King met with Mr. Rogers in late January 2019 under an NDA.

107.    After entering into the NDA, FanDuel investigated WinView Inc. and its business, including its patents.  To assist FanDuel with its due diligence into WinView's patents and technology, in early 2019, WinView Inc. disclosed to FanDuel detailed information regarding WinView Inc. and its patented technology.  WinView Inc. provided FanDuel with an intellectual property "Status Report."  WinView Inc.'s Status Report specifically identified the respective parent patent applications for the asserted '543 and '988 Patents and their respective family members.  Additionally, WinView Inc. provided FanDuel with a presentation that identified WinView Inc.'s intellectual property, including its patents.

108.    Despite WinView Inc.'s offers to partner and collaborate with FanDuel or for FanDuel to invest in WinView Inc., FanDuel declined.  Instead, FanDuel elected to continue its infringement of the Asserted Patents without permission.

109.    Given FanDuel's efforts to monitor the marketplace and investigate relevant technology and intellectual property and given FanDuel's diligence into WinView's patents, including its receipt and analysis of the Status Report identifying the applications that issued as the Asserted Patents, on information and belief, FanDuel continued to monitor the applications that issued as the Asserted Patents and was aware when they issued as the '543 and '988 Patents and that its Accused Products infringe those patents.

51

110.     Because of FanDuel's infringement and unwillingness to participate in discussions regarding WinView's intellectual property, WinView, Inc. filed this suit against FanDuel on July 19, 2021, asserting patent infringement including infringement of the '543 Patents.  Dkt. No. 1.  On July 28, 2021, WinView Inc. filed an amended complaint, adding new claims including under U.S. Patent No. 10,806,988 (the '988 Patent).  Dkt. No. 8.  These complaints alleged in detail how the FD Sportsbook and Daily Fantasy Sports websites and mobile applications practice the patents that are family members of the Asserted Patents, as specified above.

111.     FanDuel is also aware of the Asserted Patents and FanDuel's infringement because WinView sent FanDuel a detailed notice letter (the "Notice Letter") on July 25, 2025, notifying FanDuel that its Accused Products infringe the Asserted Patents.  Ex. 50 (Notice Letter).

112.     From all of the above, FanDuel had knowledge of the Asserted Patents and that its Accused Products infringe those patents prior to the filing of this action and, is further aware of its infringement of WinView's Asserted Patents from its receipt WinView original Complaint, First Amended Complaint, Notice Letter, and this Second Amended Complaint.

## COUNT I
### (Direct Infringement of U.S. Patent No. 10,721,543)

113.     WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

114.     In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '543 Patent, including without limitation exemplary Claim 118, by making, using, importing, selling, and offering for sale in the United States FD Sportsbook, FD Casino, and FD Racing (the "'543 Accused Products").

115.     FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '543 Accused Products have been without the permission, consent, authorization, or

license of WinView. Indeed, FanDuel declined WinView's request that FanDuel partner with or take a license from WinView and continues to infringe despite WinView's Notice Letter to FanDuel.

116. FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

117. FanDuel owns and controls the operation of the '543 Accused Products and generates substantial financial revenues therefrom. FanDuel puts these products into service and directs and controls their operations as the licensed operator of these systems. To the extent portions of the '543 Accused Products are hosted on AWS servers, as discussed above, FanDuel controls the operation of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on AWS servers to operate the '543 Accused Products in order to generate revenue.

118. To the extent FanDuel's customers, purchasers, users, developers, vendors, and manufacturers direct and control portions of the devices and methods in the claims, FanDuel obtains benefits from its control over the system and the performance of the claimed methods as a whole. Indeed, as the licensed operator, FanDuel is responsible for controlling, monitoring, and operating all aspects of the Accused Products.

119. FanDuel also has directly infringed and continues to directly infringe the '543 Patent by having its employees test and use the '543 Accused Products in the United States, performing the claimed methods. In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '543 Accused Products are performing as designed and intended. FanDuel further directly infringes by marketing and distributing the '543 Accused Products, which constitutes infringing offers to sell and sales.

53

120.    By way of example of FanDuel's infringement of the '543 Patent, the '543 Accused Products meet all of the limitations of exemplary Claim 118 of the '543 Patent, which recites:

Claim 118. A method implemented on a server device comprising:

sending a set of service-related information related to a location of the mobile Internet-connected computing device to an activity client, wherein the location determines the set of service related information to be loaded;

receiving a selection of a service from the activity client to be utilized by a user;

sending a set of service-specific information related to the service to the mobile Internet-connected computing device including:

sending a list of assets to the mobile Internet-connected computing device;

comparing the list of assets with a first set of assets;

sending only a second set of assets within the list of assets that are not already resident on the mobile Internet-connected computing device,

wherein the second set of assets are grouped into a set of necessary assets and a set of preferred assets; and

executing an application related to the service within the activity client on the mobile Internet-connected computing device.

121.    The '543 Accused Products infringe the '543 Patent, including exemplary Claim 118 in violation of 35 U.S.C. § 271(a)-(c). The '543 Accused Products perform a method implemented on a server, as discussed below.

122.    FanDuel operates servers within each jurisdiction in which it offers at least FD Sportsbook, FD Casino, and FD Racing, as states generally require that FanDuel's servers be located within their boundaries in order to operate. *See, e.g.*, N.Y. PML § 1367-A(h)-(i). FanDuel's servers communicate with customers' devices, which allow customers to operate Sportsbook, FD Casino, and FD Racing on their devices, and store data files there relating to odds and scores of the live sporting events, casino games, and horse racing that customers bet on.

123.    In addition to its own servers, FanDuel uses cloud-hosted services to support the operation of at least FD Sportsbook, FD Casino, and FD Racing.  Specifically, FanDuel uses AWS as its strategic cloud provider.  Ex. 43 (https://press.aboutamazon.com/2023/9/fanduel-selects-aws-as-its-strategiccloud-provider).  FanDuel uses AWS' Lambda function as a service to operate the '543 Accused Products.  Ex. 44 at 2 ("For our product our tech stack is Java for the core functionality . . . . Infrastructure wise we host our tech stack on AWS using services such as EC2, EKS, AWS Lambda, and AWS RDS managing it all with Terraform.") (https://medium.com/fanduel-life/whats-it-like-being-an-engineer-at-fanduel4505e7ca283c).

124.    Reviewing the network traffic of an Accused Product illustrates FanDuel's use of AWS' S3 (object storage system) and CloudFront (content delivery network) services which implement with Lambda.  *See, e.g.*, Ex. 39 (FanDuel's technology profile illustrating it uses AWS services such as CloudFront S3) (https://builtwith.com/fanduel.com).



Screenshot of FanDuel's network traffic with X-Amz-Cf-Id in the response header; *see also* Ex. 77 (listing X-Amz-Cf-Id as an AWS response header) (https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/RequestAndResponse BehaviorCustomOrigin.html).

125.    FanDuel has direction and control over AWS' servers via its services.  As discussed above, AWS' Customer Agreement states that FanDuel is responsible for its content, proper configuration and use of AWS services, and its end customers' compliance with FanDuel agreement with AWS, acknowledging that AWS does not provide support and services to FanDuel's customers.  Ex. 45 (AWS Customer Agreement) (https://aws.amazon.com/agreement/).

126.    Additionally, AWS' data privacy terms specify that "[FanDuel] maintain[s] full control of [its] content that [it] uploads to the AWS services . . . , and [is] responsib[le] for configuring access to AWS services and resources. . . . [FanDuel] configure[s] access control permissions for any of the services [it] develop[s] or deploy[s] in an AWS environment.  [AWS] do not access or use [FanDuel's] content for any purpose without [its] agreement."  Ex. 46 at 1 (Data Privacy FAQs) (https://aws.amazon.com/compliance/data-privacy-faq/).

127.    On these servers, FanDuel stores various data files related to the sports game (FD Sportsbook), casino game (FD Casino), or horse race (FD Racing) that a customer is betting on, including historical game data, user bets, and bet results.  For example, the screenshots below show that a user's bets are sent to and retrieved from FanDuel's servers.

 

Screenshots of FD Sportsbook, showing a bet being uploaded to the server (left) and pulled from the server (right).

128.    Customers can also retrieve their active bet data from a device different from the device they used to place the bet, which demonstrates that the bet data are saved to FanDuel's server and not just stored locally on the customers' devices.



Screenshot of the Sportsbook website showing the same bet as above being retrieved on a different device.

129.     In order to operate the '543 Accused Products, FanDuel sends data assets (a set of service-related information) to customers' devices from servers that FanDuel controls and operates. For instance, a server interacts with a '543 Accused Product app or webpage (the activity client that the customer is using to place wagers) which is downloaded to a customer's device along with contemporaneous product offerings in order to implement the '543 Accused Product service. For example, when users open FanDuel's app or website for FD Sportsbook, FD Casino, or FD Racing, they are presented with the home screen. Customers are then provided with information based on the received assets about the services, wagers, and games available to them through the accused products, such as promotions, new game offerings, suggested game offerings, and special events.

58



Screenshot of the FD Sportsbook app with service-related information



Screenshot of the FD Casino app with service-related information



Screenshot of the FD Racing app with service-related information

130.    FanDuel determines the geographic location of each customer's device used to access FD Casino.  As discussed in more detail above, FanDuel is required by law to determine its customers' physical locations, as customers must be located in a state that allows the type of wager they seek to place.   Ex. 73 (https://www.fanduel.com/casino/states-where-online-casinos-are-legal).

> **1.3.**
>
> **Location-Based Information**
>
> You will not be able to use wagering services or place bets with us without location data being turned on. Our Services use precise location-based services (e.g., location collected through GPS technology), in order to locate you so we may verify your location, process payments, perform analytics, deliver you relevant content and ads based on your location, share your location with our vendors as part of the location-based services we offer, and for purposes of legal and regulatory compliance. We also collect non-precise geolocation data (i.e., the city and state in which your device is located based on its IP address). This non-precise geolocation data allows us to customize your experience, give you access to content that varies based on your general location, and serve you ads that are relevant to you. For instance, if your IP address is associated with Baltimore, Maryland, we are able to direct you to the services, landing pages, and offers specific to individuals located in Maryland. Both precise and non-precise geolocation may be disclosed to third party entities pursuant to Section 3(c) below.

Ex. 49 at 95, FanDuel Terms and Conditions
(https://d38ayms4az88sz.cloudfront.net/SB/MI/2025-02-11T07-00-00.html#partC#partE1c).

> **Wi-Fi requirements**
>
> Fully connect to Wi-Fi, and make sure that it is set up on your device via the connection settings. Our location systems require **Wi-Fi, GPS, or GSM signals** to locate you.
>
> **\*Ethernet (wireline connection) will not pass the location check, you must be connected using a Wi-Fi connection.**
>
> If using an **Android device**, you will need to change the settings on the device to 'High Accuracy Mode', within your location settings on your device. It may also help to manually disconnect and reconnect your Wi-Fi router.
>
> A stronger network connection will help with location accuracy.

Ex. 34 at 2.

131.    FanDuel uses GPS, cellular, and Wi-Fi location services to determine the location of customers' devices.  For example, FanDuel notes in its FAQs that "[o]ur location systems require Wi-Fi, GPS, or GSM signals to locate [a user]."  Ex. 34 (FanDuel Location Troubleshooting Tips) at 2 (https://support.fanduel.com/s/article/Location-Troubleshooting-Tips#state).

62

 

Screenshots of the FD Casino app showing the location of a device is required for operation.



Screenshot of FD Sportsbook showing an error when attempting to connect in a state that does not allow sports betting.



Screen capture showing that FD Racing requires verification of the location of the device.

132.    The '543 Accused Products present a list of available options to customers based on the location of the specific customer.  Customers can then select one or more of these games and bets and place a wager.  For instance, FD Casino customers make selections related to FD Casino offerings from a list of available options provided to them based on their location, such as choosing a game from a list of available games (such as blackjack, roulette, etc.).



Screenshot of FD Casino's website showing various available games.



Screenshot of Sportsbook showing a list of available games.



Screen capture of the horse races available through FD Racing app.

133.    Upon receiving a customers' selection of a game, the '543 Accused Products download game-specific content (set of service-selection information) related to the customer's selection from the server to the customer's device (mobile Internet-connected computing device). After the server receives the customers' picks, it sends service specific information such as selection information to the customers' devices, that are downloaded to the customers' devices, such as graphical assets, game logic, sound files, etc.



Screenshot of FD Sportsbook showing service-related information sent to a customer's device, and available games returned to a customer after making a selection.

69



FD Racing downloads a set of service-specific information related to the service such as the horses racing in the selected race. Screen capture of horses racing in the selected race, Woodbine Race 9.

134.    Throughout the duration of a game, FanDuel continuously communicates with servers and the customers' devices that are running the '543 Accused Products in order to provide information such as real-time game statistics and betting information during a live gaming event (FD Sportsbook or FD Racing) or casino game (FD Casino). In order to do so, FanDuel sends lists of assets to users' devices which can be compared to the existing list of assets on the device or subsequent lists that are generated on the device. Ex. 55 (How to Bet Strategy Guide and Tips) (https://www.fanduel.com/sports-betting-strategy).



Ex. 55, showing that FanDuel continuously updates odds throughout a game.



Screen capture showing the betting odds received while playing a game in FD Racing

🎥 Play Live Dealer Casino Games - FanDuel Live Dealers Bring the Authentic Online Casino Experience Right to You! 🎥
🎲 Enjoy the FanDuel Casino Live Dealer Experience! 🎲
Whether you want Blackjack, Roulette, Baccarat, or other live dealer games, FanDuel Casino brings the excitement of a real casino right to your fingertips! Our live casino games are as realistic as they come and are available 24/7. With our skilled live dealers, you'll get a professional playing experience at tables buzzing with excitement.
FanDuel Live Casino games are hosted by real dealers and streamed to players in HD using Optical Character Recognition (OCR) technology. This technology connects players with our dealers and gaming rooms, allowing you to interact with them from the comfort of your home or office. It's a similar experience to what you'd get at brick-and-mortar casinos, recreating the traditional casino experience for you to enjoy on web, mobile, iOS, or Android.
Our live casino games include:

- Live Blackjack
- Live Roulette
- Live Baccarat
- More live dealer casino games coming soon!

Screen capture detailing FD Casino's live gaming offerings.

135. The '543 Accused Products compare this list of assets with a first set of assets in order to send a second set of assets that are not already on a customer's mobile computing device, such as a phone or a computer. As an example, FanDuel executes this process to provide its live gaming features. The continuous communication of new assets not previously received by the customer's device is evidenced by monitoring the network traffic for an in-game bet. The screenshot below shows that FD Sportsbook operating on customers' devices subscribes to data streams after the user views a live bet, indicating that FanDuel's servers are transmitting the new data assets not already located on the customer's device to that device, such as updated odds for in-game betting (FD Sportsbook or FD Racing) or updated event information or progressive odds updates (FD Casino) . Monitoring the network connection also confirms this. For example, list of assets can be retrieved using Ajax requests, which allow parts of the '543 Accused Products interfaces to update without a full reload. In the screenshot below, FD Sportsbook uses

73

getMarketPrice?priceHistory=1 to retrieve pricing data for a list of betting markets. The payload is a JSON file that contains an array of Market IDs, which each represent a distinct betting market. The request asks the server to return price data for each of these markets.



Screenshot of a FD Sportsbook pricing list of assets request.

136.    In response to the request (shown below), the server provides the requested information.



Screenshot of a FD Sportsbook pricing list of assets response.

[{eventId: 33994959,…}]
  0: {eventId: 33994959,…}
    basketballDetails: {home: {score: 9, pointsPerPeriod: [9]}, away: {score: 26, pointsPerPeriod: [26]}, currentPeriod:
      away: {score: 26, pointsPerPeriod: [26]}
        pointsPerPeriod: [26]
          0: 26
        score: 26
      currentPeriod: 1
      home: {score: 9, pointsPerPeriod: [9]}
        pointsPerPeriod: [9]
          0: 9
        score: 9
      period: "Q1"
    eventId: 33994959
    modelType: "Basketball"
    technicalInfo: {provider: "RAMP"}
      provider: "RAMP"

Second screenshot of the Sportsbook website's network traffic, showing assets transmitted for a basketball game.

[{marketId: "704.111206069", turnInPlayEnabled: true, inplay: true, bspMarket: false,…},…]
  0: {marketId: "704.111206069", turnInPlayEnabled: true, inplay: true, bspMarket: false,…}
    betDelay: 8
    bettingType: "MOVING_HANDICAP"
    bspMarket: false
    eachwayAvailable: false
    guaranteedPriceAvailable: false
    hasBPE: false
    hasSGM: false
    inplay: true
    legTypes: ["SIMPLE_SELECTION"]
      0: "SIMPLE_SELECTION"
    livePriceAvailable: true
    marketId: "704.111206069"
    marketStatus: "OPEN"
    rule4Deductions: []
    runnerDetails: [{selectionId: 7017823, runnerOrder: 10, winRunnerOdds: {,…}, previousWinRunnerOdds: [{,…}],…},…]
      0: {selectionId: 7017823, runnerOrder: 10, winRunnerOdds: {,…}, previousWinRunnerOdds: [{,…}],…}
        handicap: 65.5
        previousWinRunnerOdds: [{,…}]
          0: {,…}
            americanDisplayOdds: {americanOdds: -114, americanOddsInt: -114}
              americanOdds: -114
              americanOddsInt: -114
            decimalDisplayOdds: {decimalOdds: 1.88}
            fractionalDisplayOdds: {numerator: 100, denominator: 114}
            trueOdds: {decimalOdds: {decimalOdds: 1.87719298245614}, fractionalOdds: {numerator: 100, denominator: 114}
        runnerOrder: 10
        runnerStatus: "ACTIVE"
        selectionId: 7017823
        winRunnerOdds: {,…}
          americanDisplayOdds: {americanOdds: -122, americanOddsInt: -122}
            americanOdds: -122
            americanOddsInt: -122
          decimalDisplayOdds: {decimalOdds: 1.82}
          fractionalDisplayOdds: {numerator: 100, denominator: 122}
          trueOdds: {decimalOdds: {decimalOdds: 1.819672131147541}, fractionalOdds: {numerator: 100, denominator: 122}}
      1: {selectionId: 7017824, runnerOrder: 20, winRunnerOdds: {,…}, previousWinRunnerOdds: [{,…}],…}
        handicap: 65.5
        previousWinRunnerOdds: [{,…}]
        runnerOrder: 20

Third screenshot of the Sportsbook website's network traffic.

137.     FD Sportsbook, FD Casino, and FD Racing compare the received list of assets against the assets already on the device.   The example below shows screenshots from FD Sportsbook relating to an MLB game between the Chicago Cubs and the Texas Rangers, in which FanDuel updated the odds for the "Game Line" and "To Hit A Home Run" bets in response to a "ball" for the batter.  This shows that odds that have not changed (assets already on the device) are not updated, while new odds (assets not already on the device) are update.  FanDuel also updated the game statistics to reflect the ball, with the new game statistics being new assets not among the assets already on the device.  These screenshots show that FanDuel is providing updates with new assets, such as game statistics, score, batting information, inning information, and betting information.



Screenshots of Sportsbook before (left) and after (right) a bet updates, showing a new pitch result and updated odds, whereas other assets, such as the game score did not change.

138.    As another example, in FD Racing betting odds also constantly change, requiring the transmission of new assets (updated odds) to the customers' devices.

77



Screen captures showing the betting odds shifting for the same bet during the court of execution of the application.

139.    The '543 Accused Products receives only a second set of assets within the list of assets that are not already resident on the mobile Internet-connected computing device.  There are multiple second sets of assets that are only transmitted to customers' devices when the information changes (a new asset).  As an example, in FD Racing the original odds and race information sent to the customer's device are the first list of assets, and the second assets are the updated info, such as replacement odds based on changes in the betting pool or the race as the final payout is not determined until the total betting pool closes.

78



Screen captures of FD Racing guide on horse racing payouts and changing odds; Ex. 51 (Horse Racing 101, How payouts work) (https://racing.fanduel.com/horse-racing-101).

140.    FanDuel sends assets that grouped as necessary for executing the application, where the assets necessary for executing the application directly affect the operation of the application. For instance, updated odds information is needed to accept wagers in FD Sportsbook, FD Casino, and FD Racing and wagers cannot be accepted (meaning the application cannot operate to accept wagers) without these updated necessary assets.

141.    FanDuel also sends assets that are grouped as preferred assets, which are assets that are preferably provided to customers but that are not necessary to operate to accept wagers. Examples of preferred assets include live stream videos of active sporting (FD Sportsbooks), horse racing (FD Racing), or casino gaming (FD Casino) events as well as game scores and statistics. Whereas the wagering odds and game state information is always displayed and updated, being necessary to Sportsbook's functionality, the live stream assets are updated only preferentially,

79

depending on if the user's network is sufficiently stable and has high enough bandwidth to download it. The testing screenshot below shows two devices, one of which is set to a high latency network and the other connected to a Wi-fi network. The odds (necessary assets) are sent to both devices, but the video livestream (a preferred asset) is only sent to the device with high bandwidth.



Screen captures showing comparatively how high latency network connections are handled on by the FD Sportsbook App.

142. Similarly, a FD Casino live stream is updated only preferentially, depending on if the user's network is sufficiently stable and has high enough bandwidth to download it. The screenshot below shows two devices, one of which is set to a high latency network (left) and the other connected to a normally functioning network (right). The first device fails to load the

livestream, but loads the updated game information, while the second loads both the livestream and the game information.



An image showing an exemplary comparison of how high latency networks are handled on the FD Casino App.  For example, in the image on the left, FD Casino loads only the game play, not the live video stream behind the game play overlay as it is using a poor internet connection. In the image on the right, FD Casino loads both the game play overlay and the live video stream in the background as the device is connected to a more stable internet connection.

143.    FanDuel executes applications related to the selected option within the '543 Accused Products including, for example, the FD Sportsbook app on the user's device.  Here a user can select "Explore" on the app's home menu which opens up a list of live betting options available at a moment in time, where the user can then place bets.  The necessary and preferred assets are respectively used to provide mandatory odds and game state data used to execute wagering and also preferred assets used to execute video live streams and statistics displays for FD Sportsbook, FD Casino, and FD Racing.

144.    Thus, FanDuel '543 Accused Products satisfy all elements of exemplary Claim 118 of the '543 Patent.

145.    FanDuel's direct infringement of the '543 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

146.    The USPTO issued U.S. Patent Application No. 16/216,885 as the '543 Patent on July 21, 2020.  For the reasons discussed above in the Section entitled FanDuel's Knowledge of WinView's Asserted Patents, FanDuel became aware of the '543 Patent and aware that its activities concerning the '543 Accused Products infringed the '543 Patent no later than upon its issuance on July 21, 2020.  At the very least, FanDuel became aware of its infringement of the '543 Patent from its receipt on July 19, 2021, of WinView's Complaint, which specifically explains FanDuel's infringement of the '543 Patent, and from its receipt of WinView's First Amended Complaint on July 28, 2021, WinView's July 25, 2025 Notice Letter, and from this Second Amended Complaint.  Dkt. 1; Dkt. 8; Ex. 50.

147.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action and since its receipt of WinView's Notice Letter are willful, blatant, and in egregious disregard for WinView's patent rights in the '543 Patent.

148.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

149.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '543 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages, and any other relief in

accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '543 Patent.

## COUNT II
### (Indirect Infringement of U.S. Patent No. 10,721,543)

150. WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

151. As set forth above, FanDuel has had knowledge of its infringement of WinView's '543 Patent since at least as early as July 21, 2020, and has further knowledge of the '543 Accused Products' infringement of the '543 Patent from the July 19, 2021 Complaint, July 28, 2021 First Amended Complaint, July 25, 2025 Notice Letter, and this Second Amended Complaint.

152. As set forth above, the '543 Accused Products directly infringe the '543 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '543 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '543 Patent by using the '543 Accused Products.

153. FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '543 Accused Products, by encouraging the customers to install these products on their devices and then use the products to place wagers and play casino games. As discussed above, when the '543 Accused Products are used to gamble, they necessarily infringe the '543 Patent. This is because the location detection and asset selection and management functionality discussed with respect to Count I are necessary for the '543 Accused Products to operate and accept wagers. Therefore, FanDuel's encouragement

83

of its customers to use the '543 Accused Products to gamble necessarily encourages its customers to directly infringe the '543 Patent.

154.     As an example of FanDuel's active encouragement of its customers' direct infringement, FanDuel makes its FD Sportsbook, FD Casino, and FD Racing products conveniently accessible by offering the services on its website and mobile applications for Android, iOS, and iPadOS.



Screenshot of FD Sportsbook app as available for iOS from the Apple App Store.



Screenshot of FD Casino app as available for iOS from the Apple App Store.



Ex. 30 (screenshot of FD Racing website) (https://racing.fanduel.com/).

155.    FanDuel further encourages customers to actively engage with its support platform, which addresses FAQs and provides comprehensive resources through its instruction guides designed to assist customers.  FanDuel offers detailed guides on how to use each of FD Sportsbook, FD Casino, and FD Racing to gamble and to explain the underlying gambling concepts.  For example, FanDuel provides customers with sections like Sports Betting 101, Sports Betting Terms and How to Bet, Casino 101, How to Play Blackjack.  Ex. 55 (How to Bet Strategy Guide and Tips) (https://www.fanduel.com/sports-betting-strategy); Ex. 56 (Sports Betting Terms and How to Bet) (https://support.fanduel.com/s/article/Sports-Betting-Terms); Ex. 57 (Casino 101 | How to PlayCasino Games) (https://www.fanduel.com/casino-101); Ex. 58 (How to Play Blackjack | Learn the Rules of Blackjack) (https://www.fanduel.com/casino-101/blackjack).  As explained above, following these instructions to gamble will necessarily result in customers infringing the '543 Patent.



**How To Use FanDuel Sportsbook - Sports Betting 101**

How To Use FD Sportsbook - Sports Betting 101 (https://www.youtube.com/watch?v=TYSKuZL7xDM).

156. FanDuel's marketing aims to recruit new customers, retain current customers, and grow customer value via different marketing strategies and offerings. Ex. 61 (https://www.flutter.com/media/5afjvzl1/flutter-factsheet-jan-2024.pdf); Ex. 62 (https://www.flutter.com/media/305i1v3v/flutter-investor-day-final-website.pdf). These investments and personalized promotions are intended to increase consumer awareness and drive their infringing use of the '543 Accused Products to gamble.

157. As discussed above, FanDuel also actively markets the '543 Accused Products through several channels and methods, including promotions, loyalty programs, social media advertisements, sponsored content, in-casino advertisements, billboards, FanDuel's websites, and traditional media. Given that the '543 Accused Products always infringe when used to gamble, FanDuel's marketing directly encourages its customers to infringe.

87

158.    All the elements of the claims of the '543 Patent are used by FanDuel and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '543 Patent.

159.    FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '543 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '543 Accused Products within the United States, without authority from WinView, it is providing the '543 Accused Products which are materials and apparatuses for practicing the claimed inventions of one or more claims of the '543 Patent. The '543 Accused Products include software programs that are material components of the systems infringing one or more claims of the '543 Patent.  The '543 Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing uses.  As discussed above, when the '543 Accused Products are used to gamble, which is their only substantial intended function, they infringe the '543 Patent.  There is no purpose for the '543 Accused Products other than to accept wagers from customers, which necessarily infringes.

160.    FanDuel's indirect infringement of the '543 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

161.    FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

88

162.    FanDuel's indirect infringement of the '543 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

163.    WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## COUNT III
### (Direct Infringement of U.S. Patent No. 10,806,988)

164.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

165.    In violation of 35 U.S.C. § 271(a), FanDuel directly infringed and continues to directly infringe the '988 Patent, including without limitation exemplary Claim 64, by making using, importing, selling, and offering for sale in the United States FD Fantasy (the "'988 Accused Product").

166.    FanDuel's acts of making, using, importing, selling, and offering for sale the infringing '988 Accused Product have been without the permission, consent, authorization, or license of WinView.  Indeed, FanDuel declined WinView's request that FanDuel partner with or take a license from WinView and continues to infringe despite WinView's notice letter to FanDuel.

167.    FanDuel's infringement is based upon literal infringement or, at the very least, infringement under the doctrine of equivalents.

168.    FanDuel owns and controls the operation of its '988 Accused Product and generates substantial financial revenues therefrom.  FanDuel puts this product into service and directs and controls its operations as the licensed operator of these systems.  To the extent portions of the '988 Accused Product are hosted on AWS servers, as discussed above, FanDuel controls the operation

of the servers, puts them into use, and obtains the benefits of their use by using its software hosted on the AWS servers to operate the '988 Accused Product in order to generate revenue.

169.   To the extent FanDuel's customers, purchasers, users, developers, vendors, and manufacturers direct and control portions of the devices and methods in the claims, FanDuel obtains benefits from its control over the system and the performance of the claimed methods as a whole.  Indeed, as the licensed operator, FanDuel is responsible for controlling, monitoring, and operating all aspects of the Accused Product.

170.   FanDuel also has directly infringed and continues to directly infringe the '988 Patent by having its employees test and use the '988 Accused Product in the United States.  In order to maintain legal compliance, FanDuel is required to periodically monitor and ensure that the '988 Accused Product is performing as designed and intended.  FanDuel further directly infringes by marketing and distributing the '988 Accused Product, which constitutes infringing offers to sell and sales.

171.   By way of example of FanDuel's infringement of the '988 Patent, the '988 Accused Product meets all of the limitations of exemplary Claim 64 of the '988 Patent, which recites:

> Claim 64. A method programmed in a memory of a device comprising:
>
> a. generating a list of multiple contests of skill or chance to join;
>
> b. presenting the list of multiple contests of skill or chance to join, wherein the multiple contests of skill or chance correspond to one or more events;
>
> c. receiving user input including event selections related to the one or more events and to which of the multiple contests of skill or chance the selections are to be applied, wherein the event selections are separately applied to each of the selected multiple contests of skill or chance, wherein the event selections enable simultaneously and in real time participating in the selected multiple contests of skill or chance;
>
> d. storing results and standings based on the event selections, wherein the standings are based on the results; and

90

e. transmitting the standings to the device.

172.    FD Fantasy infringes the '988 Patent, including exemplary Claim 64, in violation of 35 U.S.C. § 271(a)-(c).  For example, it comprises a software method programmed in the memory of computer devices, as discussed below.

173.    FD Fantasy is a method programmed into the memory of a device, either installed as an app on a mobile device such as a smartphone or tablet or accessed via a computer's web browser.

174.    FanDuel utilizes one or more servers, with their associated memory and processors, to store, host, and run the contests of skill or chance that comprise FD Fantasy.

175.    FD Fantasy is based on "contests."  FD Fantasy generates and then presents to customers the list of available contests.  The screenshot below is a depiction of the operation of the FD Fantasy app's "Lobby" showing a list of available "contests:"



Screenshot of the FD Fantasy app.

176.    The FD Fantasy server conducts simultaneous multiple contests of skill or chance corresponding to one or more events. For example, the list of FD Fantasy contests available on a given day corresponds to one or more events, such as the same sporting event or set of multiple sporting events occurring on that day. FD Fantasy offers contests, for example, based on Major League Baseball, NBA, NHL, and NFL games being played on a particular day. These multiple contests are separate competitions and may differ due to available prizes, entry cost, participants, and other factors. These multiple contests are conducted simultaneously during the day as the

92

professional sports games are played in real life.  The operation of the contests is discussed in more detail above.

177.     The FD Fantasy website and app are both applications that interact with the storage mechanism.  Fantasy users may simultaneously compete in multiple FD Fantasy contests, betting on the relative performance of athletes.

178.     FD Fantasy requires all users to input event selections and contests to enter.  For example, FD Fantasy requires users to select a lineup of players to enter into the available contests to be eligible for a particular contest's prize money.

179.     FD Fantasy also offers all users the opportunity to participate in multiple contests and to do so using the same selections (e.g., lineup).  FD Fantasy enables and specifically encourages users to simultaneously participate in multiple contests using a single lineup, displaying this multi-entry functionality on the FD Fantasy application and website:





Screenshots from the FD Fantasy website and app inviting the user to submit a lineup (the customer's selections) into multiple contests.

180.    FD Fantasy stores, tracks, and maintains results and standings for each of the multiple contests selected by the user, where the results and standings for a particular user are based on the user's selections and the performance of those selections in the contest. For example, users in a basketball contest may select NBA basketball players (selections) and will receive points based on the performance of those selected players in the day's basketball games (performance of those selections in the contest). Each user will have unique results and standings for each of the multiple contests they have entered based on their selections. FanDuel implements this

94

functionality through a storage mechanism on its servers that stores the customers' selections and tabulates the customers' results and standings.

181.    FanDuel transmits the multiple and separate standings for the contests to each particular user's device, such as their internet-connected mobile phone or laptop, in real time as the contests progress and as the sporting events to which the contests relate, such as Major League Baseball games, are being played.  As the sporting events on which the selections are based are carried out, FanDuel will update the results and standings and then transmit the updated standings for each of the contests in real time.  The following screenshot displays this functionality:

95



Screenshot of the FD Fantasy website, showing players' current fantasy scores in real time.

182. Thus, FanDuel's '988 Accused Product satisfies all elements of exemplary Claim 64 of the '988 Patent.

183. FanDuel's direct infringement of the '988 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

184. The USPTO issued U.S. Patent Application No. 16/221,307 as the '988 Patent on October 20, 2020. For the reasons discussed above in the Section entitled FanDuel's Knowledge of WinView's Asserted Patents, FanDuel became aware of the '988 Patent and aware that its

96

activities concerning the '988 Accused Product infringed the '988 Patent no later than upon its issuance on October 20, 2020.  At the very least, FanDuel became aware of its infringement of the '988 Patent from its receipt on July 28, 2021, of WinView's First Amended Complaint, which specifically explains FanDuel's infringement of the '988 Patent, and from its receipt of WinView's July 25, 2025 Notice Letter, and from this Second Amended Complaint.  ; Dkt. 8; Ex. 50.

185.    FanDuel's pre-suit infringement and ongoing infringement since the filing of this action and since its receipt of WinView's notice letter are willful, blatant, and in egregious disregard for WinView's patent rights in the '988 Patent.

186.    FanDuel's infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

187.    As discussed above, FanDuel acted recklessly, willfully, and wantonly, and deliberately engaged in acts of infringement of the '988 Patent, justifying an award to WinView of increased damages under 35 U.S.C. § 284, and attorney's fees and costs incurred under 35 U.S.C. § 285.  WinView is further entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's direct infringement of the '988 Patent.

**COUNT IV**
**(Indirect Infringement of U.S. Patent No. 10,806,988)**

188.    WinView repeats, realleges, and incorporates herein by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

189.    As set forth above, FanDuel has had knowledge of its infringement of WinView's '988 Patent since at least as early as October 20, 2020, and has further knowledge of the '988 Accused Product's infringement of the '988 Patent from WinView's July 28, 2021, First Amended

97

Complaint, which specifically explains FanDuel's infringement of the '988 Patent, WinView's July 25, 2025 Notice Letter, and this Second Amended Complaint. Dkt. 8; Ex. 50.

190. As set forth above, the '988 Accused Product directly infringes the '988 Patent. FanDuel has induced and continues to induce its customers' direct infringement of one or more claims of the '988 Patent under 35 U.S.C. § 271(b) by, among other activities, knowingly, actively, and intentionally, aiding and abetting, assisting, encouraging, instructing, directing, requiring and guiding its customers to directly infringe one or more claims of the '988 Patent by using the '988 Accused Product.

191. FanDuel knowingly and actively encourages third parties, such as its customers, to use in the United States smartphones and computers that operate the '988 Accused Product, by encouraging the customers to install this product on their devices and then use the product to place wagers and play casino games. As discussed above, when the '988 Accused Product is used to gamble, it necessarily infringes the '988 Patent because the functionality giving rise to infringement is always used to accept wagers. Therefore, FanDuel's encouragement of its customers to use the '988 Accused Product to gamble necessarily encourages its customers to directly infringe the '988 Patent.

192. As discussed in more detail above with respect to the '543 Patent, FanDuel encourages and induces its customers to infringe by providing new and existing customer promotions and incentives, instructions, guidance regarding the use of the '988 Accused Product, trouble-shooting, how to and strategy guides, videos, and tutorials, which all encourage, facilitate, and incentivize customers to use the '988 Accused Product in an infringing manner.

193. For instance, the FD fantasy App is made available to iOS devices on the Apple App Store and accessible on the FD Fantasy website.



Screenshot of the FD Fantasy app on Apple App Store.



Screenshot of the FD Fantasy app on Apple App Store.



Screenshot of FD Fantasy website.

194.    FanDuel further encourages customers to actively engage with its support platform which addresses FAQs and provides comprehensive resources through its instruction guides designed to assist customers.  FanDuel offers detailed guides on how to play various games and understand the underlying concepts.  For example, it includes sections like How to Play.  Ex. 67 (FanDuel: FD Fantasy) (https://www.fanduel.com/daily-fantasy-sports).  Customers are also provided with clear explanations of how FanDuel's contests work, including FanDuel Spring Training Camp.  Ex. 68 (Training Guides) (https://www.fanduel.com/training-guides); Ex. 69 (MLB Training Guide 2021 | FanDuel) (https://www.fanduel.com/mlb-guide?t=tguides).



Screenshot of the FD Fantasy App.

195. Additionally, FanDuel provides instructions on how to use the actual Accused Product platforms, What is Auto-Draft and How do I Use It and Can I create My Own Fantasy Contest. Ex. 70 (What is Auto-Draft and how do I do it?). (https://support.fanduel.com/s/article/What-is-Auto-Draft-and-How-Do-I-Do-

It?categories=%5B%22Product.Fantasy%22%5D); Ex. 71 (Can I create my own fantasy contest?) (https://support.fanduel.com/s/article/Can-I-create-my-own-contest).

196. As discussed above, FanDuel also actively markets its Accused Product through several channels and methods, including promotions, loyalty programs, social media, advertisements, sponsored content, in-casino advertisements, billboards, FanDuel's websites, and traditional media.

197. All the elements of the claims of the '988 Patent are used by FanDuel and its customers, purchasers, users, developers, vendors, and manufacturers, or a combination thereof. As set forth above, FanDuel has known or has been willfully blind to the fact that it is inducing others to infringe by practicing, either themselves or in conjunction with FanDuel, one or more claims of the '988 Patent.

198. FanDuel also contributed to infringement of and continues to contribute to customers' infringement of one or more claims of the '988 Patent pursuant to 35 U.S.C. § 271(c). As discussed above, FanDuel has done so with knowledge or willful blindness that by selling, offering to sell, and operating the '988 Accused Product within the United States, without authority from WinView, it is providing the '988 Accused Product which is a material and apparatus for practicing the claimed inventions of one or more claims of the '988 Patent. The '988 Accused Product includes software programs that are material components of the systems infringing one or more claims of the '988 Patent. The '988 Accused Product is not staple articles or commodities of commerce suitable for substantial non-infringing uses. As discussed above, when the '988 Accused Product is used to gamble, which is its only substantial intended function, it infringes the '988 Patent.

103

199. FanDuel's indirect infringement of the '988 Patent has injured and continues to injure WinView in an amount to be proven at trial, but not less than a reasonable royalty.

200. FanDuel's indirect infringement has caused and is continuing to cause damage and irreparable injury to WinView, and WinView will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

201. FanDuel's indirect infringement of the '988 Patent is reckless, willful, wanton, deliberate and in blatant and egregious disregard for WinView's patent rights, justifying an award to WinView of increased damages under 35 U.S.C. § 284 and attorney's fees and costs incurred under 35 U.S.C. § 285.

202. WinView is entitled to injunctive relief, damages, and any other relief in accordance with 35 U.S.C. §§ 283, 284, and 285 for FanDuel's indirect infringement.

## **PRAYER FOR RELIEF**

WHEREFORE, WinView prays for judgment and relief against FanDuel as follows:

A. An entry of judgment holding that FanDuel has willfully infringed and is willfully infringing, has induced infringement of and is inducing infringement of, and has contributed to and is contributing to infringement of each of the Asserted Patents;

B. A preliminary and permanent injunction against FanDuel and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing, inducing infringement, and contributing to infringement of the Asserted Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C. An award to WinView of such damages as it shall prove at trial against FanDuel that is adequate to fully compensate WinView for FanDuel's infringement of each of the Asserted

Patents that will account for infringement up to trial based on the relevant information and financial data produced, where said damages will be no less than a reasonable royalty;

D.    An award to WinView of increased damages under 35 U.S.C. § 284 based on, *inter alia*, FanDuel's willful infringement;

E.    A finding that this case is exceptional and an award to WinView of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.    An award of prejudgment interest, post-judgment interest, and costs under 35 U.S.C. § 284;

G.    An accounting of all infringing sales and revenues from the first date of infringement; and

H.    Such other and further relief, including equitable relief, as this Court deems just and proper.

105

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), WinView hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

Dated: November 11, 2025

By: *s/ Jonathan S. Caplan*

Paul J. Andre (*pro hac vice)*
Lisa Kobialka (*pro hac vice*)
James Hannah (*pro hac vice*)
Jennifer L. Gilbert (*pro hac vice*)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (650) 752-1700
paul.andre@hsfkramer.com
lisa.kobialka@hsfkramer.com
james.hannah@hsfkramer.com
jennifer.gilbert@hsfkramer.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice*)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 715-9100
jonathan.caplan@hsfkramer.com
aaron.frankel@hsfkramer.com

Michael J. Gesualdo
ROBINSON MILLER LLC
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
(973) 690-5400
mgesualdo@rwmlegal.com

*Attorneys for Plaintiff*
WinView IP Holdings, LLC

106

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Plaintiff, by its undersigned counsel, hereby certifies pursuant to Local Civil Rule 11.2 that the matters in controversy are not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, with the exception:

*WinView IP Holdings, LLC v. FanDuel Inc.*, Civil Action No. 25-01146 (GC) (JTQ), which involves the same parties but not the same asserted patents;

*WinView IP Holdings, LLC. v. DraftKings Inc.*, Civil Action No. 21-13405 (GC) (JTQ), which involves WinView and the same asserted patents; and

*WinView IP Holdings, LLC v. DraftKings Inc.*, 25-01143 (GC) (JTQ), which involves WinView but not the same asserted patents.

Respectfully submitted,

Dated: November 11, 2025

By: *s/ Jonathan S. Caplan*

Paul J. Andre (*pro hac vice*)
Lisa Kobialka (*pro hac vice*)
James Hannah (*pro hac vice*)
Jennifer L. Gilbert (*pro hac vice*)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
(650) 752-1700
paul.andre@hsfkramer.com
lisa.kobialka@hsfkramer.com
james.hannah@hsfkramer.com
jennifer.gilbert@hsfkramer.com

Jonathan S. Caplan
Aaron Frankel (*pro hac vice*)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100
jonathan.caplan@hsfkramer.com
aaron.frankel@hsfkramer.com

Michael J. Gesualdo
ROBINSON MILLER LLC
Ironside Newark
110 Edison Place, Suite 302
Newark, New Jersey 07102
(973) 690-5400
mgesualdo@rwmlegal.com

*Attorneys for Plaintiff*
WinView IP Holdings, LLC