**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

WINVIEW IP HOLDINGS, LLC, a
Delaware Limited Liability Company,

         Plaintiff,

    v.

FANDUEL, INC., a Delaware corporation,
FANDUEL GROUP, INC., a Delaware
corporation, FANDUEL GROUP PARENT
LLC, a Delaware corporation, and BETFAIR
INTERACTIVE US LLC, a Delaware
corporation,

         Defendants.

Case No. 3:21-cv-13807-GC-JTQ

**Motion Date:  January 20, 2026**

**WINVIEW IP HOLDINGS, LLC'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................ 1

III. FANDUEL'S MOTION SHOULD BE DENIED ................................................. 2

    A. WinView Plausibly Alleges FanDuel's Infringement of the '543 Patent (Counts I and II) .......................................................................................... 2

        1. WinView Plausibly Alleges that FanDuel's Accused Products Infringe Exemplary Claim 118 of the '543 Patent ...................................... 3

        2. WinView Plausibly Alleges that FanDuel Casino and FanDuel Racing Infringe ...................................................................................... 7

    B. The SAC Provides Detailed Factual Allegations Making Plausible its Claims that FanDuel Knew of the Asserted Patents. ............................................. 11

        1. FanDuel Learned of the Asserted Patents Because They Were Well Known in the Industry ................................................................. 12

        2. WinView Disclosed the Asserted Patents to FanDuel .............................. 13

        3. FanDuel Learned of its Infringement of the Asserted Patents By Investigating WinView's Patent Portfolio .................................................. 15

        4. FanDuel Learned of Its Infringement of the Asserted Patents By Investigating WinView's Patent Application ............................................. 16

        5. FanDuel Learned of its Infringement of the Asserted Patents From WinView's Detailed Complaints .............................................................. 17

        6. FanDuel Learned of its Infringement From WinView's Notice Letter ...................................................................................................... 21

    C. WinView Plausibly Alleges FanDuel's Specific Intent to Induce Infringement ............................................................................................... 23

    D. WinView Plausibly Alleges FanDuel's Contributory Infringement ..................... 25

i

IV.    LEAVE TO AMEND SHOULD BE GRANTED TO THE EXTENT FANDUEL'S MOTION IS GRANTED ........................................................................................ 27

V.    CONCLUSION ........................................................................................................ 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Shape A/S v. Align Tech., Inc.*,
  No. 18-886-LPS-CJB, 2019 WL 1416466 (D. Del. Mar. 29, 2019)........................................14

*Alvin v. Suzuki*,
  227 F.3d 107 (3d Cir. 2000).............................................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................1, 27

*Barkan Wireless IP Holdings, L.P. v. T-Mobile US, Inc.*,
  No. 2:21-cv-00034-JRG, 2021 WL 12310942 (E.D. Tex. Nov. 18, 2021) .................11, 16, 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................1, 3, 27

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012).......................................................................................11, 24

*Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*,
  998 F.3d 1320 (Fed. Cir. 2021).............................................................................................19

*Bot M8 LLC v. Sony Corp. of Am.*,
  4 F.4th 1342 (Fed. Cir. 2021) ...............................................................................................6

*Clouding IP, LLC v. Amazon.com, LLC*,
  No. 12-641-LPS, 2013 WL 2293452 (D. Del. May 24, 2013) ...............................................21

*DIFF Scale Operation Rsch., LLC v. MaxLinear, Inc.*,
  No. CV 19-2109-LPS-CJB, 2020 WL 2220031 (D. Del. May 7, 2020) ...................................5

*Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*,
  No. CV 14-1430-LPS-CJB, 2015 WL 5725768 (D. Del. Sept. 29, 2015)...............................13

*Enovsys LLC v. T-Mobile USA, Inc.*,
  No. 2:21-cv-00368-JRG, 2022 WL 3686481 (E.D. Tex. Aug. 24, 2022) ...............................12

*Gamon Plus, Inc. v. Campbell's Co.*,
  764 F. Supp. 3d 690 (N.D. Ill. Jan. 22, 2025).......................................................................16

*Investpic, LLC v. FactSet Rsch. Sys., Inc.*,
  No. CIV. 10-1028-SLR, 2011 WL 4591078 (D. Del. Sept. 30, 2011) ...................................13

*Ioengine, LLC v. PayPal Holdings, Inc.*,
No. CV 18-452-WCB, 2019 WL 330515 (D. Del. Jan. 25, 2019) ...........................................20

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017)..............................................................................................12

*Lindis Biotech, GmbH v. Amgen, Inc.*,
No. CV 22-35-GBW, 2024 WL 1299930 (D. Del. Mar. 27, 2024)...........................................5

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).................................................................................................................23

*Moskowitz Family LLC v. Globus Med., Inc.*,
No. 20-3271, 2021 WL 6136720 (E.D. Pa. Mar. 10, 2021) ....................................................27

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018)................................................................................................5

*Nasdaq, Inc. v. IEX Grp., Inc.*,
No. 18- 3014-BRM-DEA, 2019 WL 102408 (D.N.J. Jan. 4, 2019) ...................................6, 10

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
No. CV 19-1031-RGA-SRF, 2019 WL 5626647 (D. Del. Oct. 31, 2019) ...............................17

*NovaPlast Corp. v. Inplant, LLC*,
No. 20-7396 (KM) (JBC), 2021 WL 389386 (D.N.J. Feb. 3, 2021) ........................................6

*NovaPlast Corp. v. Inplant, LLC*,
No. 23-7396 (KM) (JBC), 2021 WL 5770264 (D.N.J. Dec. 6, 2021) .........................22, 23, 25

*Novozymes N. Am., Inc. v. Danisco US, Inc.*,
No. 1:19-cv-01902-JDW, 2020 WL 12895027 (D. Del. Feb. 12, 2020)..........................11, 16

*Ravgen, Inc. v. Ariosa Diagnostics, Inc.*,
No. CV 20-1646-RGA-JLH, 2021 WL 3526178 (D. Del. Aug. 11, 2021) ............................20

*Rosenau v. Unifund Corp.*,
539 F.3d 218 (3d Cir. 2008)......................................................................................................1

*Sabinsa Corp. v. Olive Lifesciences Pvt. Ltd.*,
No. 14-4739, 2018 WL 11355086 (D.N.J. May 30, 2018)...............................................23, 24

*Soverain IP, LLC v. Microsoft Corp.*,
No. 2:17-cv-00204-RWS-RSP, 2017 WL 9802831 (E.D. Tex. Dec. 12, 2017).....................13

*Technoprobe S.p.A. v. Formfactor, Inc.*,
No. 1:23-cv-00842-JCG, 2024 WL 2271885 (D. Del. May 20, 2024)...................................16

*Telebrands Corp. v. Everstar Merch. Co.*,
   No. 17-2878 (JLL) (JAD), 2018 WL 585765 (D.N.J. Jan. 29, 2018)................................20, 22

*Telecomm Innovations, LLC v. Ricoh Co.*,
   966 F. Supp. 2d 390 (D. Del. 2013)................................................................................22, 23

*Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*,
   No. 10 C 715, 2011 WL 3946581 (N.D. Ill. Sept. 2, 2011)......................................................20

*VLSI Tech. LLC v. Intel Corp.*,
   706 F. Supp. 3d 953 (N.D. Cal. 2023) ...................................................................................18

*VoIP-Pal.com, Inc. v. Facebook, Inc.*,
   No. 6:21-cv-00665-ADA, 2022 WL 1394550 (W.D. Tex. May 3, 2022) ...............................16

*Walker Digital, LLC v. Facebook, Inc.*,
   852 F. Supp. 2d 559 (D. Del. 2012)........................................................................................22

*WinView Inc. v. DraftKings Inc.*,
   No. 21-13405 (GC) (JTQ), 2025 WL 1908757 (D.N.J. July 11, 2025).................14, 18, 19, 22

*Wrinkl, Inc. v. Facebook, Inc.*,
   No. 20-cv-01345-RGA, 2021 WL 4477022 (D. Del. Sept. 30, 2021)......................................22

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
   528 F. Supp. 3d 247 (D. Del. 2021)...................................................................................18, 19

**Other Authorities**

Fed. R. Civ. P. 15(a)(2).......................................................................................................27

## I.   INTRODUCTION

FanDuel's Motion should be denied because WinView's Second Amended Complaint (Dkt. 117, "SAC") provides detailed factual allegations that make plausible each of its causes of action.  WinView (i) describes on an element-by-element basis how FanDuel's accused products infringe each of the asserted patents and provides detailed facts establishing that FanDuel (ii) knew about the Asserted Patents and that it infringed them, (iii) had the specific intent to induce infringement by knowingly encouraging its customers to directly infringe WinView's patents, and (iv) contributed to its customers' infringement by providing software products that are material components of the systems that infringe the asserted patents and have no substantial non-infringing uses.  WinView's SAC, thus, contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" satisfying the pleading standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  FanDuel's motion should, therefore, be denied.

## II.   FACTUAL BACKGROUND

The factual allegations in WinView's complaint are deemed true for purposes of opposing this motion.  *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008).

WinView pioneered technology that transformed online gaming and solved longstanding industry problems.  Dkt. 117, ¶¶ 20-39.  The U.S. Patent and Trademark Office awarded WinView a series of patents for these inventions.  *Id.*, ¶¶ 22, 23.

WinView repeatedly invited FanDuel to enter into a partnership with WinView.  Dkt. 117, ¶¶ 105-108.  After FanDuel declined, WinView filed this case on July 19, 2021 to protect its inventions and halt FanDuel's ongoing willful infringement.   Dkt. 1.

WinView amended its initial complaint nine days after filing and filed the First Amended Complaint ("FAC") asserting an additional, newly-issued patent.  Dkt. 8.  FanDuel then filed its

1

first motion to dismiss WinView's FAC, which the Court denied.  Dkt. Nos. 82, 83.

Subsequently, WinView filed the SAC, amending the FAC to include more accused products,

new defendants, and removing two previously asserted patents from the case.  Dkt. 117.

WinView's SAC asserts that FanDuel willfully infringes U.S. Patent Nos. 10,721,543,

and 10,806,988 (the "Asserted Patents"), raising direct, willful, induced, and contributory

infringement.  Dkt. 117, ¶¶ 113-202.  The SAC provides a detailed factual explanation of how

FanDuel's accused products infringe each of the Asserted Patents, including an element-by-

element infringement analysis of representative products against representative claims.  *Id.*,

¶¶ 40-99, 113-202.

WinView's SAC further provides detailed factual allegations explaining how FanDuel

learned of the Asserted Patents and became aware that it was infringing those patents, including

through meetings and discussions with WinView, by conducting due diligence into WinView's

patent portfolio and technology, and from WinView's service of its complaints and a notice letter

on FanDuel.  Dkt. 117, ¶¶ 111-112.

FanDuel seeks to dismiss WinView's Counts I and II, which assert direct and indirect

infringement of the '543 Patent, Count IV, which asserts indirect infringement of the '988

Patent, and WinView's claims for willful infringement.  FanDuel does not seek dismissal of

Count III, which asserts direct infringement of the '988 Patent.

## III.     FANDUEL'S MOTION SHOULD BE DENIED

### A.     WinView Plausibly Alleges FanDuel's Infringement of the '543 Patent (Counts I and II)

WinView's SAC states a plausible claim that FanDuel infringes the '543 Patent by

providing detailed factual allegations identifying FanDuel's infringing products ("the '543

Accused Products") and describing on an element-by-element basis how they meet the

limitations of exemplary Claim 118.  Dkt. 117, ¶¶ 113-144 (discussing FanDuel's direct

infringement), 54-69 (discussing operation of FD Sportsbook), 70-75 (FD Racing), 76-81 (FD

Fantasy), and 82-84 (FD Casino).  The SAC, therefore, readily passes muster under Rule

12(b)(6) with respect to the '543 Patent, which requires only that it plead enough facts to make

infringement plausible and give fair notice to FanDuel of what is at issue.  *Twombly*, 550 U.S. at

570.  The plausibility standard "does not impose a probability requirement at the pleading stage;

it simply calls for enough fact to raise a reasonable expectation that discovery will reveal

evidence" to support the plaintiff's allegations.  *Id*. at 556.

### 1. WinView Plausibly Alleges that FanDuel's Accused Products Infringe Exemplary Claim 118 of the '543 Patent

Claim 118 of the '543 Patent includes eight limitations, which together provide a method

for efficiently providing assets from a server to customers' devices.  Dkt. 117, ¶ 120.  FanDuel

concedes that the SAC's allegations are sufficient for seven of those limitations and only

challenges the sufficiency of the allegations as to "sending only a second set of assets . . .

wherein the second set of assets are grouped into a set of necessary assets and a set of preferred

assets" (the "Grouping Limitation").  Dkt. 123-1 ("Motion") at 6.  FanDuel's challenge fails both

legally and factually.

*First,* the SAC provides detailed factual allegations supporting the plausible inference

that the '543 Accused Products satisfy the Grouping Limitation, where a second set of assets are

grouped into necessary assets—which must be received—and preferred assets—that are not

required to be received.  Dkt. 117, ¶¶ 140-143.

The SAC alleges that the '543 Accused Products classify assets by functional necessity

and enforce that classification during delivery and updating.  For example, the SAC alleges that

the '543 Accused Products require certain "***necessary assets***," such as updated odds, in order for

3

wagering to occur.  Dkt. 117, ¶ 140.  Wagers cannot be accepted unless these assets are delivered to the user device, and the application's wagering functionality depends on their continued availability and updating.  *Id.*  These assets are therefore treated by the system as required inputs to application execution.

The SAC separately alleges that the '543 Accused Products handle other assets differently when those assets are "preferred assets" that are "not necessary to operate [or] to accept wagers."  Dkt. 117, ¶141.  Assets such as "live stream videos of active sporting (FD Sportsbooks), horse racing (FD Racing), or casino gaming (FD Casino) events as well as game scores and statistics" are instead treated as optional or enhancement-based content.  *Id.*, ¶¶ 141, 143.  The SAC, thus, does not leave this distinction abstract; it pleads how the '543 Accused Products enforce the distinction in operation between necessary and preferred assets.

The SAC further alleges testing which shows that when two user devices access the same live event under different network conditions, both devices receive and update wagering odds and game-state data which are necessary assets, but only the device with sufficient bandwidth receives the live video stream, a preferred asset.  Dkt. 117, ¶ 141.  Under identical application logic and event conditions, the system delivers one category of assets to both devices—the necessary assets—while conditionally delivering another category only to one—the preferred assets.  This is a system-level classification enforced through delivery rules, not a mere preference or display choice.

The SAC also alleges the same operational behavior in FD Casino.  When network conditions are poor, FD Casino loads only the necessary gameplay and wagering information but does not load the preferred live video stream; when conditions are sufficient, it loads both.  Dkt. 117, ¶ 142.  In each scenario, wagering-related necessary content is delivered irrespective of

bandwidth, while livestream preferred content is conditionally withheld.  The system's behavior turns on what type of asset is being delivered, not on ad hoc transmission failures.

The SAC further alleges that this distinction is implemented across the '543 Accused Products—FD Sportsbook, FD Casino, and FD Racing—and that the two categories correspond to mandatory wagering execution assets versus optional livestream and statistics assets.  Dkt. 117, ¶ 143.  Taken together, the system delivers wagering-required assets unconditionally and enhancement assets conditionally, which necessarily reflects a classification decision made by the system.

These detailed factual allegations identify the accused functionality and explain how the systems differentiate assets in execution, satisfying the Grouping Limitation, which is more than sufficient at the pleading stage to state a claim.  *See Lindis Biotech, GmbH v. Amgen, Inc.*, No. CV 22-35-GBW, 2024 WL 1299930, at *3 (D. Del. Mar. 27, 2024) (the "Complaint properly pleads 'some facts [] that show[] why it is *plausible* that the [accused] product[] infringe[s]'") (quoting *DIFF Scale Operation Rsch., LLC v. MaxLinear, Inc.*, No. CV 19-2109-LPS-CJB, 2020 WL 2220031, at *2 (D. Del. May 7, 2020)).[1]

The plausibility of WinView's allegations is further supported by the SAC's citation to evidence including FanDuel's publicly available disclosures identifying its use of specific servers, network traffic data captured from product testing showing the transmission of the mandatory and optional data assets discussed above, and screen captures evidencing the referenced functionality.  Dkt. 117, ¶¶ 121-143.  These allegations provide exemplary facts that

---

[1] FanDuel does not clearly articulate its interpretation of the Grouping Limitation.  To the extent FanDuel is arguing plausibility based on a narrow construction of the Grouping Limitation, it is raising a claim construction "dispute not suitable for resolution on a motion to dismiss." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1349 (Fed. Cir. 2018).

further satisfy the pleading standard by "plac[ing] [FanDuel] 'on notice of what activity . . . is being accused of infringement.'" *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021). These allegations are more than sufficient to satisfy the pleading standard, and FanDuel's demand for more is unsupported. For this reason, FanDuel's reliance on *NovaPlast* is misplaced. The *NovaPlast* plaintiff merely quoted claim language without asserting any facts as to how any accused product met the limitations of the claims, which is very different from WinView's detailed allegations addressing every limitation of the exemplary claim for an exemplary product. *See NovaPlast Corp. v. Inplant, LLC*, No. 20-7396 (KM) (JBC), 2021 WL 389386, at *6-7 (D.N.J. Feb. 3, 2021).

*Second*, the Federal Circuit made clear that a patent complaint need not plead facts for "every element of every claim" to state a claim. *Bot M8*, 4 F.4th at 1352. Instead, WinView needs only allege facts that, taken as true, make infringement plausible. *Id.* at 1353. Thus, FanDuel's allegation that the SAC does not sufficiently address the Grouping Limitation is not a valid basis to seek dismissal, in addition to being wrong on the facts in view of the detailed allegations discussed above. *Id.*

*Third*, WinView is not required at the pre-discovery stage to provide technical details that are uniquely within a defendant's control. *See, e.g., Nasdaq, Inc. v. IEX Grp., Inc.*, No. 18-3014-BRM-DEA, 2019 WL 102408, at *12 (D.N.J. Jan. 4, 2019) (denying in part motion to dismiss: "To the extent [Defendant] argues the Complaint does not specify the precise methods [used] in its infringing device, at this stage of the litigation, all [Plaintiff] has access to is . . . public statements, . . . The specifics of how [Defendant's] purportedly infringing device works is something to be establish through discovery."). WinView already provided ample details of the operation of the Accused Products and the Grouping Limitation based on publicly available

6

information.  FanDuel is not entitled to demand more at this stage, especially when it is the only party with access to non-public details about the functionality of its Accused Products.

### 2. WinView Plausibly Alleges that FanDuel Casino and FanDuel Racing Infringe

WinView plausibly alleges that FD Racing and FD Casino applications infringe the '543 Patent.  WinView's SAC alleges that each product directly infringes exemplary Claim 118 of the '543 Patent and explains that FanDuel operates and controls the servers that implement the accused functionality in these products.  Dkt. 117, ¶¶ 70-75 (discussing FD Racing), 82-84 (discussing FD Casino), 91-94 (discussing the '543 Accused Products), 113-144 (alleging infringement); 117-118, 122-127 (alleging that FanDuel operates and controls the servers that implement the accused functionality, including AWS-hosted components, and "puts them into use" to deliver the accused methods).

The SAC also discusses important functionality that is common across all the Accused Products, such as asset management, server-device communication, geolocation, and using servers and the AWS Cloud to transmit gambling data to customers' devices.  Dkt. 117, ¶¶ 49-53, 91-94, 117, 123-127, 129-131.  The SAC then provides an exemplary detailed analysis of how the '543 Accused Products, including FD Racing and FD Casino app infringe the '543 Patent, establishing the plausibility of its Count I.  *Id.*, ¶¶ 127-143.  FanDuel does ***not*** challenge the sufficiency of these allegations as to FD Sportsbook (except as discussed above with respect to the Grouping Limitation).

WinView explains that the FD Sportsbook infringement analysis applies equally to the other Accused Products at issue, including FD Racing and FD Casino.  Dkt. 117, ¶¶ 114, 129 (alleging FanDuel sends service-related information to operate all '543 Accused Products

including FD Sportsbook, FD Racing, FD Casino).  As pleaded, the '543 Patent's claimed functionality is not limited to traditional sports betting, and the SAC does not treat it as such.

**FD Casino**.  The SAC provides a fulsome discussion of FD Casino and detailed factual allegations supporting its claim that this product practices all the claim limitations, including the "comparing the list of assets with a first set of assets" and "sending only a second set of assets." The SAC alleges that FD Casino is a real-time iGaming platform that delivers gameplay and wagering information to user devices and, in parallel, delivers live video streams as part of the gaming experience.  Dkt. 117, ¶¶ 82-84, 142.  The SAC then pleads concrete, product-specific operational facts showing how FD Casino manages and delivers these classes of assets during execution.

Specifically, the SAC provides testing demonstrating that FD Casino conditionally delivers live video stream assets (preferred assets) depending on network stability and bandwidth, while continuing to load and operate gameplay and wagering information (necessary assets) even when the livestream is not delivered.  Dkt. 117, ¶ 142.  When network conditions are insufficient, FD Casino "loads only the game play, not the live video stream behind the game play overlay," and when conditions are sufficient, it loads both.  *Id*.  Those allegations describe FD Casino's real-time execution behavior and plausibly allege that FD Casino performs the claimed asset-management functions by distinguishing between assets required to operate the application and assets that enhance the experience.

Those allegations are detailed and plausible, not conclusory.  They identify the type of assets involved (gameplay/wagering information versus live video), the conditions under which each is delivered, and the resulting system behavior on the user device.  Dkt. 117, ¶ 142.  At the pleading stage, WinView is not required to provide screenshots for each internal processing step

8

or to plead FanDuel's internal code paths.  The SAC's FD Casino allegations are tied to real-world operation and are sufficient to make infringement plausible and put FanDuel on notice of the issues in the case.

      **FD Racing**.  The SAC likewise pleads that FD Racing is a real-time wagering platform that allows users to place wagers on live horse races and to live stream those races to their devices.  Dkt. 117, ¶¶ 70-75.  The SAC alleges that FD Racing operates as part of FanDuel's suite of real-time wagering applications and shares the same relevant functionality for purposes of infringement.  For example, the SAC explains that "[w]hile FD Racing offers betting on horse races and the FD Sportsbook offers betting on other sporting events, for purposes of infringement, the relevant functionality in FD Racing, FD Sportsbook, and FD Casino *is the same*."  *Id.*, ¶ 71 (emphasis added).  That assertion is not conclusory; it is supported by the detailed description in the SAC of how FD Racing streams live races and provides betting opportunities in real time, just as FD Sportsbook streams sporting events and provides betting opportunities in real time.  *Id.*, ¶¶ 68-69, 71, 73-75.

      When the SAC later pleads infringement of the '543 Patent, it identifies the accused functionality—real-time asset delivery, updating, and execution under varying conditions—as common across the Accused Products, including FD Racing.  Dkt. 117, ¶¶ 122-144.  Rule 12 does not require WinView to re-plead identical technical details separately for each product where the SAC plausibly alleges that the products implement the same relevant system behavior.  The SAC's allegations as to FD Racing explain what the product does (live wagering with live streaming), how it operates (real-time interaction during events), and why it plausibly practices the asserted claims when read together with the infringement allegations applicable to the Accused Products as a group.  *Id.*, ¶¶ 70-75, 122-144.

In addition, given that both products perform the same gambling functionality and differ only in the specific sporting events that are being gambled on, it is more than plausible to infer that FD Racing operates in the same infringing way as Sportsbook. Therefore, it is plausible to infer that FanDuel uses the same service-related information delivery method for its various Accused Products, including FD Casino and FD Racing. Thus, WinView's detailed allegations for FD Sportsbook—unchallenged by FanDuel—plausibly establish infringement as to the other products which have the same functionality.

WinView was not required to provide additional discussions of FD Racing and FD Casino because there is no requirement that a complaint discuss every accused product with respect to every limitation in order to state a patent infringement claim. FanDuel does not cite to a single case supporting this proposition, because there are none. Under the Local Patent Rules, WinView will provide such detailed element-by-element infringement contentions in claim charts for each accused product once discovery begins in this case. *See* D.N.J. L. Pat. R. 3.1(c). WinView's SAC directs FanDuel to the infringing functionality at issue and provides reasonable notice of WinView's allegations, which is all that is required at this stage. *Nasdaq*, 2019 WL 102408, at *10, *12 (denying motion to dismiss where the complaint was "sufficient to provide [defendant] with reasonable notice of the specific way it is allegedly infringing on [the] patent").

In short, the SAC alleges that FD Casino and FD Racing are real-time wagering and gaming platforms that operate using the same asset-management and delivery functionality that forms the basis of WinView's infringement claims. The SAC provides FanDuel with fair notice of the Accused Products and the basis for the infringement allegations, and it plausibly states claims against FD Casino and FD Racing under Rule 12. Thus, FanDuel fails to show that dismissal is warranted.

**B.      The SAC Provides Detailed Factual Allegations Making Plausible its Claims that FanDuel Knew of the Asserted Patents.**

WinView's Complaint alleges that FanDuel willfully and indirectly infringed the Asserted Patents based on its knowledge of WinView's Asserted Patents.  WinView's SAC pleads a collection of both pre- and post-filing facts which, collectively, plausibly establish that FanDuel had the requisite knowledge of both the Asserted Patents and of its infringement.  These allegations include: (i) that FanDuel knew of the Asserted Patents through industry knowledge; (ii) WinView's numerous publications; (iii) the multiple discussions and meetings between the parties regarding WinView's patents and technology; (iv) WinView's repeated disclosures of its patent portfolio to FanDuel starting in January 2019; (v) FanDuel's knowledge of the patent applications leading to the Asserted Patents and their family members; (vi) FanDuel's investigation into WinView's patents; (vii) WinView's provision of due diligence materials to FanDuel regarding its patents; and (viii) FanDuel's ongoing infringement after it received a patent infringement notice letter and WinView's complaints.  Dkt. 117, ¶¶ 100-112.

WinView's detailed factual allegations, discussed below, when "taken together," are more than sufficient to make plausible its allegations that FanDuel knew of WinView's Asserted Patents, warranting denial of FanDuel's motion to dismiss, especially when all reasonable inferences are drawn in WinView's favor, as is required at this stage.  *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1340 (Fed. Cir. 2012) (finding error when district court dismissed indirect infringement claims after failing to draw reasonable inferences in the plaintiff's favor); *see also Barkan Wireless IP Holdings, L.P. v. T-Mobile US, Inc.*, No. 2:21-cv-00034-JRG, 2021 WL 12310942, at *1, *3 (E.D. Tex. Nov. 18, 2021) (considering totality of circumstances in denying motion to dismiss); *Novozymes N. Am., Inc. v. Danisco US, Inc.*, No. 1:19-cv-01902-JDW, 2020 WL 12895027, at *2 (D. Del. Feb. 12, 2020)

11

("[T]he Court need not evaluate whether each allegation, standing alone, gives rise to a reasonable inference that [FanDuel] had pre-suit knowledge."). More is not required to state a claim because WinView is not "required to prove its case at the pleading stage." *Enovsys LLC v. T-Mobile USA, Inc.*, No. 2:21-cv-00368-JRG, 2022 WL 3686481, at *2 (E.D. Tex. Aug. 24, 2022) (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017)).

### 1.    FanDuel Learned of the Asserted Patents Because They Were Well Known in the Industry

The SAC plausibly alleges that FanDuel learned about the Asserted Patents from WinView's repeated disclosures. WinView disclosed all of its patents, including the Asserted Patents, to "FanDuel and other participants in the online gaming industry. . . [through] the intellectual property page of its website," which WinView regularly updated as the Asserted Patents issued. Dkt. 117, ¶¶ 101-102. The SAC further supports this allegation with an exemplary exhibit showing WinView's long-standing patent-marking practice from "[a]t least as early as December 2015." *Id.*, ¶ 101 (citing Ex. 47 to SAC). WinView also described its portfolio of patents to the industry through press releases and publicly available statements. *Id.*, ¶ 102. As discussed in more detail in Section III(B)(3) below, FanDuel conducted an ongoing investigation into WinView's patents, supporting the plausible inference that it would have learned of the Asserted Patents from WinView's disclosures to the industry of its patents as they issued. *Id.*, ¶¶ 101-104.

The plausibility of FanDuel's knowledge of the Asserted Patents from disclosures to the industry, is further supported by "[t]he significance of WinView's patents [which] is illustrated by the fact that they have been cited by subsequently filed patents as relevant art over 253 times, with 49 citations specifically to the Asserted Patents." Dkt. 117, ¶¶ 38, 103. Such factual allegations that a patent is known in the industry are enough to "infer . . . that an individual

defendant had knowledge of it" and rebut FanDuel's assertion that the SAC does not allege industry knowledge of the asserted patents from frequent citations. *Investpic, LLC v. FactSet Rsch. Sys., Inc.*, No. CIV. 10-1028-SLR, 2011 WL 4591078, at *2 (D. Del. Sept. 30, 2011); Motion at 17. "These pleaded facts are relevant not because the Court is imputing the knowledge of [FanDuel's] competitors to [FanDuel], but because if true (as the Court must assume them to be), they render it more likely that [FanDuel]" may have been similarly aware of the Asserted Patents and WinView's patent portfolio, especially when viewed in combination with the SAC's other allegations discussed below. *Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*, No. CV 14-1430-LPS-CJB, 2015 WL 5725768, at *3 (D. Del. Sept. 29, 2015), *report and recommendation adopted*, No. CV 14-1430-LPS-CJB, 2016 WL 1274812 (D. Del. Mar. 31, 2016); *Soverain IP, LLC v. Microsoft Corp.,* No. 2:17-cv-00204-RWS-RSP, 2017 WL 9802831, at *1 (E.D. Tex. Dec. 12, 2017) (denying motion to dismiss allegations of willful infringement supported by public knowledge of the asserted patents).

## 2.     WinView Disclosed the Asserted Patents to FanDuel

WinView's SAC plausibly alleges that FanDuel knew about the Asserted Patents from WinView's repeated disclosures. Between 2017 and 2019, WinView and FanDuel engaged in a series of communications regarding WinView's technology and Asserted Patents leading to multiple disclosures of WinView's patented technology. Dkt. 117, ¶¶ 105-110. The SAC alleges that in early 2017, WinView's CEO and founder, David Lockton, contacted FanDuel's CEO and co-founder, Nigel Eccles, to arrange a discussion on potential synergies between WinView's patent portfolio and technologies and FanDuel and potential partnerships between the two companies. *Id.*, ¶ 105. Over the years, various WinView and FanDuel executive personnel met and communicated regarding WinView's patented technology, including discussions between WinView's Executive Chairman Tom Rogers and FanDuel's then-CEO,

13

Mr. Eccles, in addition to subsequent discussions between WinView and FanDuel's new CEO, Mr. King.  *Id.*, ¶¶ 106-107.

The SAC plausibly alleges that FanDuel gained knowledge of WinView's patents from these meetings.  This allegation is plausible because FanDuel's CEO acknowledged there were "[l]ots of similar interests here" with regards to the two companies and the patented technology. Dkt. 117, ¶ 105.  Further, as the SAC alleges, the parties explored these similarities as is evidenced by FanDuel's initiation of an investigation into WinView under NDA.  Under the NDA, WinView made additional disclosures to FanDuel, including providing an intellectual property "Status Report," which specifically disclosed to FanDuel the respective patent applications that issued as the Asserted Patents.  *Id.*, ¶ 107.  The SAC further alleges that WinView disclosed "a presentation that identified WinView Inc.'s intellectual property, including its patents" to FanDuel.  *Id.*

These collective facts indicate that FanDuel had access to WinView's patent portfolio and understood these patents applied to FanDuel's product offering because there were lots of "similar interests."  *Id.*, ¶ 105.  The combination of these facts is sufficient to plausibly infer FanDuel's knowledge of the asserted patents from WinView's disclosures.  *3Shape A/S v. Align Tech., Inc.*, No. 18-886-LPS-CJB, 2019 WL 1416466, at *2 (D. Del. Mar. 29, 2019) ("[T]he Federal Circuit has held that knowledge of infringement . . . may be inferred based on surrounding circumstances," taken as a whole.).

Further, these facts resemble those at issue in *University of Massachusetts Medical School v. L'Oreal S.A.*, where "talks between [defendant] and the patent holder about licensing the patent at issue" supported the plausibility of the inference that the defendant had knowledge of its infringement.  *WinView Inc. v. DraftKings Inc.*, No. 21-13405 (GC) (JTQ), 2025 WL

1908757, at *9-10 (D.N.J. July 11, 2025) ("*DraftKings I*"); *Univ. of Mass. Med. School*, Civ. No. 17-868-CFC-SRF, 2018 WL 5919745, at *8-9 (D. Del. Nov. 13, 2018), *report and recommendation adopted*, 2019 WL 2151701, at *2 (D. Del. May 17, 2018), *rev'd. and remanded on other grounds*, 36 F.4th 1374 (Fed. Cir. 2022). The factual allegations in the SAC regarding the talks between the parties correspond to the facts in *University of Massachusetts* and support drawing the same inference that WinView's repeated discussions with FanDuel regarding licensing its patents put FanDuel on notice that it needed a license to WinView's patents to avoid infringement.

### 3. FanDuel Learned of its Infringement of the Asserted Patents By Investigating WinView's Patent Portfolio

The SAC's allegations that FanDuel investigated WinView's patent portfolio further supports the plausibility of WinView's allegations that FanDuel had the requisite knowledge of the Asserted Patents and of its infringement, including based on a combination of facts that predate and that follow the issuance of the Asserted Patents.

FanDuel investigated WinView and its patent portfolio, in connection with the series of meetings between the parties between 2017 and 2019, discussed above. Dkt. 117, ¶¶ 105-112. The SAC alleges that these conversations led to FanDuel investigating WinView's patented technology. *Id.,* ¶¶ 105-107. From this investigation, FanDuel plausibly gained knowledge of the asserted patents because WinView gave FanDuel its intellectual property Status Report, which identified the patent applications leading to the Asserted Patents. *Id.* ¶ 107. In addition to these conversations and disclosures specifically tied to the Asserted Patents, WinView provided FanDuel with a presentation that identified its intellectual property portfolio. *Id.*

These facts collectively detail both FanDuel's interest and attention to WinView's patent portfolio and the parties' shared awareness of the potential for partnership, all of which support

15

the plausibility of the inference that FanDuel knew of the Asserted Patents and of its infringement. *See VoIP-Pal.com, Inc. v. Facebook, Inc.*, No. 6:21-cv-00665-ADA, 2022 WL 1394550, at *2 (W.D. Tex. May 3, 2022) (denying motion to dismiss and finding that allegation that defendant's "monitoring of [p]laintiff's patent portfolio" based on knowledge of pending patent applications coupled with ongoing litigation was sufficient to infer pre-suit knowledge of the asserted patents); *Technoprobe S.p.A. v. Formfactor, Inc.*, No. 1:23-cv-00842-JCG, 2024 WL 2271885, at *1, *3-4 (D. Del. May 20, 2024) (finding it plausible that defendants had pre-suit knowledge of asserted patents from attending presentations regarding the patented technology).

### 4. FanDuel Learned of Its Infringement of the Asserted Patents By Investigating WinView's Patent Application

FanDuel's knowledge is further plausible because WinView disclosed its patent applications that ultimately issued as the Asserted Patents to FanDuel. Dkt. 117, ¶¶ 105-107. "At the pleading stage, alleged knowledge of patent family members and related patents, along with other allegations, can be sufficient to overcome a motion to dismiss." *Novozymes*, 2020 WL 12895027, at *3; *see also Gamon Plus, Inc. v. Campbell's Co.*, 764 F. Supp. 3d 690, 707 (N.D. Ill. Jan. 22, 2025) (disclosure to defendant of applications that subsequently issued as the asserted patents supported denial of a motion for summary judgment of no knowledge of the subsequently issued asserted patents). Thus, the similar allegations at issue here support denial of FanDuel's motion.

The SAC alleges that WinView disclosed these patent applications to FanDuel through its portfolio Status Report, and from this it is plausible that FanDuel monitored these applications through their issuance. For example, in *Barkan Wireless IP Holdings, L.P. v. T-Mobile US, Inc.*, a defendant's knowledge of the patent application was deemed sufficient to render plausible the

allegation that the defendant was also aware of the asserted patent that issued from the application. 2021 WL 12310942, at *3.

FanDuel's argues that WinView's patent applications were not available to the general public when it met with WinView. Motion at 16. This ignores that WinView provided FanDuel with confidential information about its patent portfolio under an NDA. FanDuel's reliance on *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. CV 19-1031-RGA-SRF, 2019 WL 5626647, at *3 (D. Del. Oct. 31, 2019) is, misplaced. Motion at 15. The relevant facts in that case were limited to a single meeting before the asserted patent issued with no allegations comparable to those at issue here where the parties had ongoing meetings and WinView disclosed confidential information about its portfolio to FanDuel. 2019 WL 5626647, at *4; Dkt. 117, ¶¶ 105-109.

### 5.    FanDuel Learned of its Infringement of the Asserted Patents From WinView's Detailed Complaints

In addition to the pre-suit activity discussed above, WinView's service of its complaints on FanDuel supports the plausibility of the inference that FanDuel's post-filing infringement is willful and that FanDuel has sufficient post-suit knowledge of its infringement to induce and contribute to its customers' infringement. Dkt. 117, ¶¶ 95-100. WinView's complaints include detailed allegations explaining how FanDuel's Accused Products infringe the Asserted Patents and that FanDuel is continuing its conduct despite knowing that it is infringing. *See, e.g., id.*, ¶¶ 25-39, 40-84, 102-112.

*First,* as discussed above, FanDuel had pre-suit knowledge of its infringement of the Asserted Patents, which is sufficient to establish its post-suit knowledge of infringement.

*Second*, WinView does not rely on its complaints alone to satisfy the knowledge requirement. Instead, WinView relies on the totality of the factual allegations in the SAC,

17

including allegations of pre-suit knowledge based on the WinView's public disclosures and the prominence of WinView's patents in the industry, WinView's disclosures to FanDuel through meetings with key personnel, the parties' pre-issuance correspondence regarding WinView's patents and technology, FanDuel's investigation of WinView Inc. and WinView's patent portfolio during which WinView gave it access to confidential documents regarding its patents, and the Notice Letter (discussed in the following section).

Thus, this case is very different from *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251-52 (D. Del. 2021), which found that enhanced damages were not intended to "provide a financial incentive for opportunistic plaintiffs to spring suits for patent infringement on innocent actors who have ***no knowledge*** of the existence of the asserted patents." *Id.* (emphasis added). WinView repeatedly attempted to engage FanDuel in business discussions and made it apparent that WinView was seeking a partnership or licensing. Accordingly, FanDuel had ample warnings of its infringement and was not an innocent actor caught unaware by WinView's complaints.

*Third*, Defendants' citation to the Court's ruling in *DraftKings I* is inapposite because WinView's SAC includes additional facts which were not before the Court when it decided the motion in that instance. Motion at 14; *DraftKings I*, 2025 WL 1908757, at *11 (collecting cases). The Court explained that "because a complaint and infringement contentions are a necessary part of patent litigation, a finding that they ***alone*** satisfy post-suit notice would invite claims of willful infringement and indirect infringement into literally every patent suit." *DraftKings I*, 2025 WL 1908757, at *11 (emphasis added) (quoting *VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953, 996 (N.D. Cal. 2023)). There are multiple reasons the Court should reach a different result here including detailed factual allegations regarding FanDuel's in-depth

18

investigation into WinView's patents, FanDuel's possession of the "Status Report" in which WinView disclosed the patent applications leading to the Asserted Patents, WinView's presentation providing its patent portfolio, numerous conversations between key personnel regarding WinView's patented technology, and the Notice Letter. *Id.*; Dkt. 117, ¶¶ 100-112. Thus, WinView's knowledge allegations go far beyond just serving a complaint and a different outcome is appropriate here.

*Fourth*, as the Court acknowledged in its *DraftKings I* Order, courts "are split on the issue of whether knowledge can be established based on the filing of a complaint." *DraftKings I*, 2025 WL 1908757, at *10. Although the Court need not reach this issue because the totality of WinView's factual allegations goes far beyond the mere filing of a complaint, WinView respectfully requests that the Court consider following the line of cases finding that a complaint can support post-suit knowledge.

The Federal Circuit reached this issue in *Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320 (Fed. Cir. 2021), which came after the *ZapFraud* case upon which FanDuel relies. In *Bio-Rad*, the respondent appealed from an ITC determination of inducement and contributory infringement, arguing *inter alia* that "the evidence showed that [it only] had knowledge of patent applications and not [the issued asserted] patents." *Id.* at 1335. The Federal Circuit agreed with the patent owner "and the Commission that substantial evidence supports the Commission's findings regarding indirect infringement," including that respondent knew of the asserted patents "at least ***by the filing of the complaint*** in this investigation, ***which is sufficient for indirect infringement*** in this case" and noting that the respondent continued to "engage in infringing activities even after [complainant] filed its complaint." *Id.* at 1335-36 (emphasis added). The Federal Circuit's *Bio-Rad's* holding applies squarely to the facts at issue here.

19

In this District, Magistrate Judge Dickson found that allegations that defendants had notice of infringement "since their receipt of the Complaint in this matter . . . and yet still created and sold the allegedly infringing [p]roducts" was "sufficient to establish a plausible entitlement to enhanced damages." *Telebrands Corp. v. Everstar Merch. Co.*, No. 17-2878 (JLL) (JAD), 2018 WL 585765, at *8 (D.N.J. Jan. 29, 2018).

Multiple other courts have come to the same conclusion, finding that a complaint including detailed infringement allegations, such as WinView's SAC, can establish post-filing knowledge. *See, e.g., Ioengine, LLC v. PayPal Holdings, Inc.*, No. CV 18-452-WCB, 2019 WL 330515, at *4-5 (D. Del. Jan. 25, 2019) (finding post-suit knowledge through the complaint sufficient to sustain indirect and willful infringement claims); *Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*, No. 10 C 715, 2011 WL 3946581, at *4 (N.D. Ill. Sept. 2, 2011) (acknowledging split in authority, but finding it more "practical" to establish knowledge via a complaint because there is no valid reason for a defendant who is aware of its infringement to avoid liability for indirect infringement "simply because it happened to learn of the patents in connection with a lawsuit"); *Ravgen, Inc. v. Ariosa Diagnostics, Inc.*, No. CV 20-1646-RGA-JLH, 2021 WL 3526178, at *4 (D. Del. Aug. 11, 2021) ("[I]f [FanDuel] is on notice of a patent and the allegations of the infringement as a result of [the] filing of a pleading, there is no reason it should not be answerable for willful infringement after that date if [WinView] can prove the requisite level of culpable behavior during the post-suit period.") (citing *Ioengine*, 2019 WL 330515, at *7 n.4).

Therefore, WinView's original complaint, FAC, and SAC provided FanDuel with notice sufficient to support post-filing willfulness and indirect infringement because, "[f]or purposes of pleading willful infringement, there appears to be little practical difference between a pre-

20

complaint notice letter informing a defendant about a patentee's allegation of infringement and a subsequently-superseded original complaint formally alleging infringement." *Clouding IP, LLC v. Amazon.com, LLC*, No. 12-641-LPS, 2013 WL 2293452, at *4 (D. Del. May 24, 2013).

### 6.     FanDuel Learned of its Infringement From WinView's Notice Letter

Before filing the SAC, WinView sent FanDuel a notice letter that provided further notice of the Asserted Patents and that FanDuel was infringing them. Dkt. 117, ¶ 111; Dkt. 117-6, Ex. 50 ("Notice Letter"). WinView's Notice Letter told FanDuel that its "products and services infringe one or more claims of at least" the '543 and '988 Patents and that it "is directly infringing each of the above-listed patents with respect to the following products and services in the United States: FanDuel Sportsbook and Casino; FanDuel Casino; FanDuel Fantasy Sports; … and FanDuel Racing," the Accused Products at issue in this action. Dkt. 117, ¶¶ 40, 146-147; Notice Letter at 1-2.

The Notice Letter provided additional notice of FanDuel's infringement, stating that "[t]hese products directly infringe WinView patents. In addition, FanDuel, at least by supplying its products and services to the U.S. marketplace and U.S. consumers, is contributing to the infringement of each of the above-listed patents by U.S. consumers through their infringing use of the above-listed FanDuel products and services." Notice Letter at 2. WinView also put FanDuel on notice of its indirect infringement, stating that, "FanDuel, by providing instructions for the use of FanDuel products and services, is inducing its customers' infringement of each of the above-listed patents through their use of the above-listed FanDuel products and services." *Id*. WinView's Notice Letter concluded by stating that "FanDuel's ongoing infringement of WinView's patents in view of the above notice is willful," and demanded that "FanDuel immediately cease its willfully infringing activities related to the above-listed patents and seek to enter into a license to WinView's patents." *Id*. at 3; Dkt. 117, ¶¶ 119-120, 170-171.

21

As the Court noted in *DraftKings I*, "in the context of pre-suit knowledge of infringement, a plaintiff may commonly overcome a motion to dismiss through references to cease-and-desist letters." *DraftKings I*, 2025 WL 1908757, at \*10 n.15 (citing *NovaPlast Corp. v. Inplant, LLC*, No. 23-7396 (KM) (JBC), 2021 WL 5770264, at \*10 (D.N.J. Dec. 6, 2021)). As held in *Telebrands* and in *Telecomm Innovations, LLC v. Ricoh Co.*, 966 F. Supp. 2d 390 (D. Del. 2013), "there is no legal impediment to having an indirect infringement cause of action limited to post-litigation conduct," such as FanDuel's ongoing infringement after its receipt of the Notice Letter. 966 F. Supp. 2d at 393 (quoting *Walker Digital, LLC v. Facebook, Inc.,* 852 F. Supp. 2d 559, 565 (D. Del. 2012)); *see also Telebrands Corp.*, 2018 WL 585765, at \*8 (finding that plaintiff's complaint provided defendant with sufficient notice of the patents and defendants' infringement).

Requiring that a notice letter be provided before filing "would be the equivalent of saying that the plaintiff's failure to give notice of the patents outside of litigation operated as a bar to bringing a suit for indirect infringement," which is not a warranted outcome. *Wrinkl, Inc. v. Facebook, Inc.*, No. 20-cv-01345-RGA, 2021 WL 4477022, at \*7 (D. Del. Sept. 30, 2021) (finding that a "plaintiff should be allowed to amend a complaint to allege knowledge since the filing of the original complaint"). As explained in *Walker Digital*, "it is instructive to bear in mind the fundamental purpose of asserting indirect infringement, that is, to ensure that the patentee can recover full compensation," and, as a result, "post-litigation conduct" is a sufficient basis to progress a case beyond the pleading stage. 852 F. Supp. 2d at 565. Thus, the Notice Letter further supports WinView's claims of post-suit willful and indirect infringement and warrants denial of FanDuel's motion.

22

C.    **WinView Plausibly Alleges FanDuel's Specific Intent to Induce Infringement**

In addition to establishing FanDuel's knowledge of the Asserted Patents, the Complaint pleads facts supporting the "common sense inference" that FanDuel had the specific intent to induce infringement. *NovaPlast*, 2021 WL 5770264, at *9. Specifically, WinView alleges that in addition to FanDuel's knowledge of its infringement, FanDuel continues to take "active steps . . . to encourage direct infringement." *Sabinsa Corp. v. Olive Lifesciences Pvt. Ltd.*, No. 14-4739 (JBS/KMW), 2018 WL 11355086, at *3 (D.N.J. May 30, 2018) (citation omitted) (finding defendant's active steps to encourage direct users' infringement combined with awareness of the asserted patent support an inference of intent to induce infringement).

FanDuel's actions to encourage customers' infringing use of the Accused Products include making the Accused Products available through various channels to customers, promoting the Accused Products, offering incentives for customers to gamble with the Accused Products such as promotional offers, marketing and advertising the Accused Products, and offering Help Center and FAQ sites to support and encourage customer use. Dkt. 117, ¶¶ 6, 56-58, 70, 85-90, 153-157, 191-196. For instance, FanDuel provides detailed guides to customers on the proper means to use the accused "FD Sportsbook, FD Casino, and FD Racing to gamble and [explains] the underlying gambling concepts" such as Sports Betting 101. *Id.*, ¶ 155.

These allegations state a claim for inducement because "advertising an infringing use or instructing [customers] how to engage in an infringing use, shows an affirmative intent that the product be used to infringe." *Sabinsa*, 2018 WL 11355086, at *3 (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)); *see also Telecomm Innovations*, 966 F. Supp. 2d at 394-95 (finding allegation that defendant had knowledge of the patents and provided technical support to customers on its infringing use sufficient to plead indirect infringement).

23

As the Federal Circuit has determined, the SAC's allegations that FanDuel advertises the benefits accomplished through utilization of the infringing patented method are sufficient to plausibly infer FanDuel's intent to induce infringement. *See In re Bill of Lading*, 681 F.3d at 1341-42 (finding that common sense indicates such advertisements reasonably inferred the defendant's intent to induce its customers to infringe). In addition to FanDuel's FAQs, it also directs users to "download the FanDuel GeoComply plugin," notes that "location [is] collected through GPS technology" and requires users' locations "for purposes of legal and regulatory compliance." Dkt. 117, ¶¶ 49-50, 53, 60, 130. Therefore, FanDuel's advisements and directions of the benefits of the Accused Products related to the patented technology give rise to the reasonable inference that FanDuel had the specific intent to induce its users to infringe. *See In re Bill of Lading*, 681 F.3d at 1341-42; Motion at 22.

FanDuel's application of *Straight Path IP Group, Inc. v. Vonage Holdings Corp.* is also misplaced, because WinView's allegations of FanDuel's encouragement of infringement are neither "conclusory" nor "contradictory," as was the case in *Straight Path.* No. 14-502 (JLL) (JAD), 2014 WL 3345618, at *2 (D.N.J. July 7, 2014); Motion at 22. Rather, WinView provides specific allegations with supporting examples detailing FanDuel's acts to encourage infringement in combination with allegations of FanDuel's knowledge. Dkt. 117, ¶¶ 6, 70, 85-90, 153-157, 191-196.; *see also Sabinsa*, 2018 WL 11355086, at *3 (allegations that the defendants advertised and instructed infringement "support[ed] an inference that any of [defendants'] infringing sales of the [accused product] were done with the specific intent to induce its customers to infringe").

While not required to state a claim for induced infringement, WinView further alleges that the Accused Products always infringe when used for gambling and that, because gambling is

24

the only purpose of the Accused Products, there is no substantial non-infringing use for the Accused Products. *See, e.g.*, Dkt. 117, ¶¶ 54-90, 99, 114, 130, 152, 159, 165, 172, 190, 198. Thus, FanDuel's encouragement of its customers' use of the Accused Products to gamble is necessarily encouragement of their infringement of the Asserted Patents, a fact that WinView repeatedly disclosed to FanDuel when it explained that its patents cover core functionality used in the Accused Products. *Id.*

These facts establish FanDuel's knowledge of infringement and, "[a]t a minimum [show FanDuel is] knowingly proceeding at risk," which is enough to support the plausible inference that FanDuel had the requisite specific intent to induce infringement. *See NovaPlast*, 2021 WL 5770264, at *8-9 (denying defendants' motion to dismiss inducement claims).

**D.     WinView Plausibly Alleges FanDuel's Contributory Infringement**

WinView's SAC plausibly alleges FanDuel's contributory infringement by explaining (i) how each Accused Product infringes, (ii) that the gambling software FanDuel provides to customers is a material component of the infringing systems, and (iii) that there are no substantial non-infringing uses of the Accused Products because, when they "are used to gamble, which is their only substantial intended function, they infringe" the Asserted Patents. *See, e.g.*, Dkt. 117, ¶¶ 54-84, 85-90, 99, 114, 130, 152-153, 159, 165, 172, 190, 198.

For instance, with respect to the '543 Patent, the SAC explains that the '543 Accused Products "are materials and apparatuses for practicing the claimed inventions of one or more claims of the '543 Patent" and identifies FanDuel's software programs included within the '543 Accused Products as material components of the infringing system. *Id.*, ¶ 159. The SAC specifies that they are exclusively used for gambling and that there are no non-infringing uses for the Accused Products. *See, e.g., id.*, ¶¶ 159, 198. For instance, the SAC details the central use of the infringing geolocation features to ensure legal compliance which must be implemented in

25

game offerings like the Accused Products. *Id.*, ¶¶ 50-53, 130-132, 153, 158-159. The SAC further states that, without such compliance functionality, the Accused Products would not be operational. *Id.*, ¶¶ 50-53, 130-132, 153.

As an example, with regards to the '543 Accused Products, the Complaint states "FanDuel determines the geographic location of each customer's device . . . . FanDuel is required by law to determine its customers' physical locations, as customers must be located in a state that allows the type of wager they seek to place." *Id.*, ¶¶ 130-131. The SAC further provides a screenshot of a '543 Accused Product preventing a user from accessing a game while located in a jurisdiction with legal restrictions on gambling. *Id.*, ¶ 131. These factual allegations establish that these components are central to the use of the Accused Products to operate infringing gambling services, establishing their materiality.

The SAC includes similar detailed allegations for the other Accused Products and Asserted Patents. *See, e.g.*, Dkt. 117, ¶¶ 54-84, 85-90, 99, 114, 130, 152-153, 159, 165, 172, 190, 198. Thus, the SAC provides detailed and specific factual allegations to support the conclusion that the Accused Products contribute to infringement when used to gamble and have no substantial non-infringing use. FanDuel's argument that the Accused Products have multiple non-infringing uses falls short when the SAC's allegations are considered, including that FanDuel directs its users to use the Accused Products in an infringing way including as an example, directions to "download the FanDuel GeoComply Plugin" to obtain the users location, and FanDuel's explanation that location is required "for purposes of legal and regulatory compliance," for betting and gambling which is an infringing use. *Id.*, ¶¶ 49-50, 53, 60, 130; Motion at 23-24. Therefore, the SAC adequately pleads that the accused products had to be used to practice the infringing method, and thus there is no substantial non-infringing use.

26

These detailed allegations are not merely "a legal conclusion couched as a factual allegation," as FanDuel contends.  Motion at 24.  Instead, WinView's detailed allegations exceed the requirement at this stage of proceedings where "[a] simple allegation that the product at issue is not suitable for substantial non-infringing use is generally sufficient to satisfy the pleading requirements of *Twombly* and *Iqbal*," and FanDuel's motion to dismiss WinView's contributory infringement claims should be denied.  *Moskowitz Family LLC v. Globus Med., Inc.*, No. 20-3271, 2021 WL 6136720, at *5 (E.D. Pa. Mar. 10, 2021) (denying motion to dismiss contributory infringement claim).

## IV.    LEAVE TO AMEND SHOULD BE GRANTED TO THE EXTENT FANDUEL'S MOTION IS GRANTED

While there are numerous reasons for the Court to deny FanDuel's Motion, even if the Court were inclined to grant it, dismissal should be with leave to amend to address any shortcomings.  Dismissal with prejudice is a "severe and disfavored remedy," especially here where it would be the first in this case and where it would be WinView's first amendment to cure any deficiencies.  *Alvin v. Suzuki*, 227 F.3d 107, 122 (3d Cir. 2000) (citations omitted); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Here, FanDuel argues (incorrectly) that WinView should have provided additional allegations for the Grouping Limitation of the '543 Patent and more specifically explained how FD Casino and FD Racing infringe.  While WinView will provide these detailed allegations in its infringement contentions once discovery begins, it can readily do so in an amended complaint to the extent the Court finds it is required to do so.  Further, WinView would amend to attach the Status Report it provided to FanDuel and additional allegations regarding FanDuel's knowledge to address issues raised by FanDuel.  Thus, leave to amend would not be futile and would permit adjudication on the substantive merits, rather than on pleading formalities.

27

## V.   CONCLUSION

For the reasons stated herein, FanDuel's motion should be denied.

Respectfully submitted,

Dated: December 22, 2025          By: _s/ Jonathan S. Caplan_
Jonathan S. Caplan
Aaron Frankel (*pro hac vice*)
Carlos J. Tirado (*pro hac vice* to be filed)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 715-9100
jonathan.caplan@hsfkramer.com
aaron.frankel@hsfkramer.com
carlos.tirado@hsfkramer.com

Paul J. Andre (*pro hac vice*)
Lisa Kobialka (*pro hac vice*)
James Hannah (*pro hac vice*)
Jennifer L. Gilbert (*pro hac vice*)
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel.: (650) 752-1700
paul.andre@hsfkramer.com
lisa.kobialka@hsfkramer.com
james.hannah@hsfkramer.com
jennifer.gilbert@hsfkramer.com

Michael J. Gesualdo
ROBINSON MILLER LLC
Ironside Newark
110 Edison Place, Suite 302
Newark, NJ 07102
(973) 690-5400
mgesualdo@rwmlegal.com

*Attorneys for Plaintiff*
WinView IP Holdings, LLC

28

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned, hereby certify that on December 22, 2025, the foregoing document was electronically filed using the Court's CM/ECF system which will send an email notification to counsel of record.

By: *s/ Jonathan S. Caplan*
Jonathan S. Caplan